mA

# UNITED STATES DISTRICT COURT

**FILED**

# NORTHERN DISTRICT OF ILLINOIS

DEC 09 2016 TM

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# EASTERN DIVISION

| | |
|---|---|
| SANJAY TYAGI, ALKA JAGATIA, and A.T., a minor, by and through his parents and all others similarly situated, | 16cv11236<br>Judge Thomas M. Durkin<br>Magistrate Judge Young B. Kim |
| Plaintiffs, | |
| vs. | |
| GEORGE SHELDON, individually;<br>CAROLYN K. ROSS, individually;<br>MARKO I DJURISIC, individually;<br>DONALD JONKER, individually;<br>LAWRENCE ALBERG, individually;<br>DEANNA LARGE, individually;<br>NORA HARMS PAVELSKI, individually;<br>STEVIE LEMON, individually;<br>ERAINA ROSS BURLESON, individually;<br>MARISOL RUBIO, individually; SYLVIA TORRES STEPHENS, individually;<br>ANN & ROBERT H LURIE CHILDREN'S HOSPITAL OF CHICAGO, a private entity;<br>ANN & ROBERT H LURIE CHILDREN'S HOSPITAL OF CHICAGO FOUNDATION, a private entity;<br>PEDIATRICS FACULTY FOUNDATION INC, a private entity;<br>CHILDREN'S HOSPITAL OF CHICAGO MEDICAL CENTER, a private entity;<br>LURIE CHILDREN'S MEDICAL GROUP LLC, a private entity; | **COMPLAINT FOR DAMAGES**<br><br>**Claim 1: Violation of Federal Civil Rights**<br>**Claim 2: Monell-Related Claims**<br>**Claim 3: Intentional Infliction of Emotional Distress**<br>**Claim 4: Negligent Infliction of Emotional Distress**<br>**Claim 5: Abuse of Process**<br>**Claim 6: Invasion of Privacy**<br>**Claim 7: Declaratory Relief**<br>**Claim 8: Preliminary Injunctive Relief**<br><br>**[JURY DEMANDED]** |

DR. LEON EPSTEIN, MD, individually;
DR. ALMA BICKNESE, MD, individually;
DR. JENNA KRUEGER, MD, individually;
DR. MELISSA CIRRILLO, MD,
individually;
DR. LAUREN MARSILLIO, MD,
individually;
DR. RANA MAFEE, MD, individually;
AND DOES 1 THROUGH 100,
INCLUSIVE,

          Defendants.

Plaintiffs, SANJAY TYAGI ("Sanjay" or "Sanjay Tyagi") and ALKA JAGATIA ("Alka" or "Alka Jagatia") and A.T., respectfully represent and allege as follows:

## JURISDICTION

1. SANJAY TYAGI, ALKA JAGATIA and A.T. bring this civil rights lawsuit pursuant to 42 U.S.C. Section 1983 to redress the deprivation by Defendants, at all times herein acting under color of state law, of rights secured to Plaintiffs under the United States constitution, including the First, Fourth, Sixth and Fourteenth Amendments, and under federal and state law where applicable.

2. This District Court of the United States has original, concurrent, and supplementary jurisdiction over this cause of action, pursuant to the authorities cited above, including, but not limited to the following, to: 18 U.S.C. § 241, 18 U.S.C. § 242, 28 U.S.C. § 1331, 28 U.S.C. § 1332(a), 28 U.S.C. § 1343(a)(3), 28 U.S.C. § 1367,       28 U.S.C.§ 1441(b),  28 U.S.C. § 1441(c), 28 U.S.C. § 1441(e), 28 U.S.C. § 1443(1), 28 U.S.C. § 1443(2),  28 U.S.C. § 1446, 42 U.S.C. § 1983, and 42 U.S.C. § 1988.

3. The District Court of the United States is an Article III court with authority to hear questions arising under the Constitution, Laws, and Treaties of the United States,

including but not limited to the Bill of Rights, the First Amendment, the Fourth

Amendment, the Sixth Amendment, the Ninth Amendment, the Eleventh

Amendment, the original Thirteenth Amendment, the Fourteenth Amendment, the

International Covenant on Civil and Political Rights, and the Universal

Declaration of Human Rights, with Reservations. See the Article VI Supremacy

Clause of the Constitution of the United States of America, as lawfully amended

(hereinafter "U.S. Constitution").

4.  This suit is not against the State itself. A suit against the State Actors under the

color of state law is not a suit against the government. The plaintiffs are seeking

relief from the State Actors and Private Actors who have acted illegally. The State

Actors are acting in excess of state statutory authority and have not done things

required by state law. Such State Actors and Private Actors can derive no

protection from an unconstitutional statute of a State. **This suit is not precluded**

**by the Eleventh Amendment or its emanations of sovereign immunity.**

5.  No suit has ever been filed by any of the parties in State Courts and as such there

are no State Court proceedings and decision in this matter. **The Rooker-Feldman**

**doctrine and Anti-Injunction Act (AIA) under 28 U.S.C. § 2283 does not**

**apply to this suit.**

6.  This action arises under the First, Fourth, Sixth and Fourteenth Amendments to the

United States Constitution, and under federal law, particularly 42 U.S.C. § 1983.

7. This Court has jurisdiction of this action under, and by virtue of, **28 U.S.C. § 1331**, **28 U.S.C. § 1332(a)**, **28 U.S.C. § 2201-02**, **28 U.S.C. § 1343(a)(3)**, **18 U.S.C. § 241**, **18 U.S.C. § 242**, **42 U.S.C. § 1983**, **42 U.S.C. § 1988**

8. This Court is authorized to grant Plaintiffs prayer for relief regarding injunctive relief, costs, jury trial and damages including a reasonable attorney's fee, pursuant to **42 U.S.C. § 1988**.

9. Jurisdiction is conferred on this court by **28 U.S.C. § 1367(a)**, which provides this court with supplemental jurisdiction over all claims which are so related to the other claims that they form part of the same case or controversy under Article III of the United States Constitution. Supplemental jurisdiction over this claim is appropriate because the claims stated arise from the same nucleus of operative facts as the claims over which this court has original jurisdiction.

10. This Court has subject matter jurisdiction of this complaint pursuant to **28 U.S.C. § 1331** where there is an Article III federal question and pursuant to **42 U.S.C. § 1983**, wherein a State actor, under color of state law, has deprived the Plaintiff of fundamental rights secured by the United States Constitution. **Under 28 U.S.C § 1331**, the district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

11. Numerous State and Private Actors, under color of state law, have deprived the Plaintiffs of fundamental rights secured by the United States Constitution. This

court has subject matter jurisdiction of this complaint pursuant to **42 U.S.C. §1983**.

12. The jurisdiction of this Court is also invoked pursuant to the provisions of **28 U.S.C. §1343(a)(3)**, this being a suit in equity authorized by law, 42 U.S.C. §1983, to be commenced by any citizen of the United States or other person within the jurisdiction thereof to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of United States and the laws of the United States. The rights, privileges, and immunities secured by this action, are rights, privileges and immunities secured by the Constitution and specifically the right to due process.

13. The jurisdiction of this Court is further invoked pursuant to the provisions of **18 U.S.C. §241** where two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States.

14. Furthermore, the jurisdiction of this Court is invoked pursuant to the provisions of **18 U.S.C.§242** where whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges,

or immunities secured or protected by the Constitution or laws of the United States.

15. Petitioners complain of various willful, systemic deprivations of fundamental Rights guaranteed by the Federal Constitution, and/or by federal law, and which deprivations are civil violations of 42 U.S.C. § 1983, and also criminal violations of 18 U.S.C. §§ 241 and 242.

16. Petitioners have duly advised the defendants, numerous State Actors and Private Actors, and all other parties – multiple times in official writing each – that certain actions and judicial events are now existing, have been done, and are now further threatened against the Petitioners, in clear, unambiguous violations of basic due process, the Federal Constitution, state statutory law, federal statutory law, the relevant rulings by the high state courts, and/or against the relevant rulings held unanimously by all of the several federal Circuit Courts of Appeals.

17. This Court is authorized to grant declaratory judgment under the **Federal Declaratory Judgment Act, 28 U.S.C. §2201-02**, implemented through Rule 57 of the Federal Rules of Civil Procedure, and to issue the preliminary and permanent injunctive relief requested under Rule 65 of the Federal Rules of Civil Procedure and the provisions of applicable sections of the U.S. Code that are not specifically asserted and/or are inadvertently omitted in this action that pertain to declaratory relief and the jurisdiction of this court.

18. The amount in controversy exceeds $75,000 exclusive of interest and costs. Under **28 U.S.C. § 1332(a)**, the United States Federal District Court has subject matter jurisdiction.

19. This action seeks preliminary and permanent injunctive relief from the state actor Defendants and private party Defendants in this matter.

20. The jurisdiction of this Court is also invoked where Parents' interest in the care, custody, and control of their children is among the most venerable of the liberty interests protected by the Constitution. The United States Supreme Court has described the right to raise one's children by one's own lights rather than the government's as "essential", {Meyer v. Nebraska, 262 U.S. 390, 399 (1923)} "one of the basic civil rights of man" {Skinner v. Oklahoma, 316 U.S. 535, 541 (1942)} and "far more precious . . . than property rights." {May v. Anderson, 345 U.S. 528, 533 (1953)}. This constitutional guarantee rests upon the nation's "strong tradition of parental concern for the nurture and upbringing of their children." parents' rights to choose which physician and medical care plan they believe best serves the interests of their child. State interference in the child's medical care in these cases constitutes a gross violation of parents' fundamental rights. It also disserves the interests of children, which, our constitutional system recognizes, are best served by allowing their parents the discretion to make such choices.

21. The jurisdiction of this Court is also invoked where a Parents' Constitutional Right to make health care decisions for their children has been violated. The Supreme Court has zealously guarded parents' constitutional rights to make decisions for their children for almost a century. In the 1923 case of Meyer v. Nebraska, and again in Pierce v. Society of Sisters two years later, the Court overturned state statutes on the ground that they "unreasonably interfere[d] with the liberty of parents . . . to direct the upbringing and education of [their] children." {Pierce v. Soc'y of Sisters, 268 U.S. 510, 534 (1925)}. In the Court's words, "[t]he fundamental theory of liberty . . . excludes any general power of the state to standardize its children. . . .. The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." A generation later, the Court stated again that "[I]t is cardinal with us that the custody, care and nurture of the child reside first in the parents." {(Prince v. Massachusetts, 321 U.S. 158, 166 (1944)}.

22. The jurisdiction of this Court is also invoked where the Courts have made clear that parents' constitutionally protected authority over their children includes the right to make decisions regarding health care. {Parham v. J.R., 442 U.S. 584, 602 (1977)}. Further, the presumption that fit parents act in the best interests of their children also extends to medical decision making. Parents' right to determine

COMPLAINT FOR DAMAGES – PAGE 9 OF 91

1   medical care is not, of course, absolute. The boundary between parents' medical

2

3   decision-making rights and the state's right to intervene based on dependency law

4   is one vulnerable to incursion. Accordingly, parents' rights require careful

5   protection in abuse and neglect cases to ensure that they are not eroded by the

6   state. To safeguard parents' decision-making rights, courts have declared that

7
    "[s]tate intervention is justifiable only under compelling conditions." {In re Storar,
8

9   420 N.E.2d 64, 73 (N.Y. 1981); In re Hofbauer, 393 N.E.2d 1009, 1014 (N.Y.

10  1979)}. In the case of in re Hofbauer, the New York Court of Appeals refused to

11
    declare a child with Hodgkin's disease a neglected child although his parents
12

13  declined the standard treatment of radiation and chemotherapy, instead placing

14  him on nutritional therapy and injections of laetrile. {In re Hofbauer, 393 N.E. 2d

15  at 1015}. According to the Court, "great deference must be accorded a parent's

16
    choice as to the mode of medical treatment to be undertaken and the physician
17

18  selected to administer the same. The most significant factor in determining

19  whether a child is being deprived of adequate medical care, and, thus, a neglected

20
    child within the meaning of that statute, is whether the parents have provided an
21

22  acceptable course of medical treatment for their child in light of all the

23  surrounding circumstances. This inquiry cannot be posed in terms of whether the

24  parent has made a "right" or "wrong" decision, for the present state of the practice

25
    of medicine, despite its vast advances, very seldom permits such definitive
26

conclusions. Nor can a court assume the role of a surrogate parent and establish as the objective criteria with which to evaluate a parent's decision its own judgment as to the exact method or degree of medical treatment which should be provided, for such standard is fraught with subjectivity."

23. The jurisdiction of this Court is invoked where a parent's federal liberty right to custody of their child and the relationship between a parent and child has been determined to be essential and autonomous and where parental rights are protected under federal law.

24. The jurisdiction of this Court is also invoked where state and private actors have intervened under color of state law and based on broad deference to the physician's judgments and none to parents' and these actions have breached parents' constitutional rights. The decision maker best positioned to resolve the conflict is generally not a state child protection official who has spent little to no time with the child. Instead, it is the parent who knows the child best, is most motivated to ensure their welfare, and who has seen the child's medical issues develop over time. Such governmental intervention generally disserves the best interests of children. As the Supreme Court recognized, "[t]hat some parents 'may at times be acting against the interests of their children' creates a basis for caution, but is hardly a reason to discard wholesale those pages of human experience that teach that parents generally do act in the child's best interests." {Parham v. J.R.,

442 U.S. 584, 602- 03 (1977)}. Further, "[s]imply because the decision of a parent . . . involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state."

25. The jurisdiction of this Court is invoked where any threatened deprivation of a parent's liberty right to custody requires due process and a finding, by "clear and convincing" evidence, of parental unfitness.

26. The jurisdiction of this Court is invoked where Plaintiffs liberty right to custody of his children have been threatened to be denied under the privileges and immunities clause of the Fourteenth Amendment of the U.S. Constitution; where Plaintiff has been denied due process under the Fourteenth Amendment; where Plaintiff has been denied equal protection under the Fourteenth Amendment; where Plaintiffs right to freedom of association with his children has been threatened and infringed upon pursuant to the First Amendment; where Plaintiffs right to privacy in his autonomous parent-child relationship has been threatened to be denied under the Ninth and Fourteenth Amendments; where Plaintiffs federal right to custody of his children has been threatened pursuant to the Supremacy Clause in Article IV of the U. S. Constitution; and where Plaintiff has been denied free exercise of his federal rights; all of which have been denied by the Defendants under color of state law.

27. The jurisdiction of this Court is invoked where both DCFS rules and Illinois statutes lack express due process requirements, including an explicit evidentiary standard of "clear and convincing" evidence. Without an explicit evidentiary standard, Defendants cannot deprive either parent of their federal right without a finding of parental unfitness. Without an explicit burden of proof, Illinois law is arbitrary and discretionary, and facially unconstitutional as written.

28. A case in controversy exists where Plaintiff is subject to the continuing jurisdiction of the State Actors in Illinois Department of Children and Family Services; the unconstitutional actions of their agents and employees; and the facially unconstitutional laws as noted in this Complaint. Therefore, prospectively, Plaintiff has standing to bring this action in Federal Court.

29. The jurisdiction of this Court is invoked where the federal subject matter is an independent federal question and where the independent question is not inextricably intertwined with any state court judgment. Separately, and in addition to, Plaintiff presents a general challenge to the constitutionality of State law. Plaintiff is not requesting that a State court judgment be overturned, altered, or modified by this Court. There is no bar to declaratory relief of independent federal questions and/or to a general constitutional challenge of state law.

30. The jurisdiction of this Court is invoked where the Plaintiffs liberty right to freedom of religion have been threatened and violated. These rights are available

to every United States citizen under the **First Amendment of the U.S. Constitution**;

31. The jurisdiction of this Court is invoked where the Plaintiffs liberty right to be secure in their person, house, papers and effects against unreasonable searches and seizures have been violated. These rights are available to every United States citizen under the **Fourth Amendment of the U.S. Constitution**;

32. The jurisdiction of this Court is invoked where the Plaintiffs right to right to confront and cross examine adverse witnesses and right to compel witnesses to testify have been violated. State Actors under the color of State law refused to enforce the subpoena for 39 properly subpoenaed defendants who failed to appear. appear. These people were also emailed the scanned subpoena letter by email as courtesy. The plaintiffs did not get the chance to question and cross examine the defendants. These rights are available to every United States citizen under the Sixth Amendment of US Constitution. **Sixth amendment of US Constitution** grants the right to confront and cross examine adverse witnesses and right to compel witnesses to testify.

## VENUE

33. Venue is proper under 28 U.S.C § 1391 (b). Each and all of the acts alleged herein were done by Defendants within this Judicial district and under the color and pretense of the statutes, ordinances, regulations, customs, and uses.

## RESERVATION OF RIGHTS DUE TO FRAUD

34. Petitioners hereby explicitly reserve their fundamental Right to amend this and all subsequent pleadings, should future events and/or discoveries prove that they have failed adequately to comprehend the full extent of the damages which they have suffered at the hands of the Defendants and other involved parties, both named and unnamed, under the color of State law now and at all times in the future. See Rules 8, 15, and 18 of the Federal Rules of Civil Procedure.

## PARTIES

35. Plaintiffs Sanjay Tyagi and Alka Jagatia and their minor son A.T. are individuals and citizens of the United States, protected by 42 U.S.C. § 1983.

36. Defendant GEORGE SHELDON ("George Sheldon" or "George") is the Director of Illinois Department of Children and Family Services. Defendant Director is generally charged with the overall administration of Illinois DCFS. He was at all times relevant herein acting under color of State law. Defendant Sheldon is sued herein in his individual capacity.

37. Defendant CAROLYN K. ROSS ("Carolyn Ross" or "Ross") is the Chief Deputy Director of Illinois Department of Children and Family Services. Defendant Ross is sued herein in her individual capacity.

38. Defendant MARKO I. DJURISIC ("Marko Djurisic" or "Djurisic") is the Administrative Law Judge in Illinois Department of Children and Family Services. Defendant Djurisic is sued herein in his individual capacity.

39. Defendant DONALD JONKER ("Donald Jonker" or "Jonker") is Senior Litigation Counsel in Illinois Department of Children and Family Services. Defendant Jonker is sued herein in his individual capacity.

40. Defendant LAWRENCE ALBERG ("Lawrence Alberg" or "Alberg") is an Attorney in Illinois Department of Children and Family Services. Defendant Alberg is sued herein in his individual capacity.

41. Defendant DEANNA LARGE ("Deanna Large" or "Large") is SCR Administrator in Illinois Department of Children and Family Services. Defendant Large is sued herein in her individual capacity.

42. Defendant NORA HARMS PAVELSKI ("Nora Harms Pavelski" or " Pavelski ") is Deputy Bureau Chief of Child Protection in Illinois Department of Children and Family Services. Defendant Pavelski is sued herein in her individual capacity.

43. Defendant STEVIE LEMON ("Stevie Lemon" or "Lemon") is DCP Supervisor in Illinois Department of Children and Family Services. Defendant Lemon is sued herein in his individual capacity.

44. Defendant ERAINA ROSS BURLESON ("Eraina Ross Burleson" or "Burleson") is Investigator and Social Worker, Illinois Department of Children and Family Services. Defendant Burleson is sued herein in her individual capacity.

45. Defendant MARISOL RUBIO ("Marisol Rubio" or " Rubio") is Investigator and Social Worker, Illinois Department of Children and Family Services. Defendant Rubio is sued herein in her individual capacity.

46. Defendant SYLVIA TORRES STEPHENS ("Sylvia Torres Stephens" or " Sylvia") is Investigator and Social Worker, Illinois Department of Children and Family Services. Defendant Sylvia is sued herein in her individual capacity.

47. Hereinafter, when referred to collectively, the Defendants in paragraphs 36 through 46, inclusive, will be referred to as Social Worker Defendants.

48. Dr. LEON EPSTEIN ("Leon Epstein" or " Epstein") is a doctor at Ann & Robert H. Lurie Children's Hospital of Chicago. Defendant Epstein is sued herein in his individual capacity.

49. Dr. ALMA BICKNESE ("Alma Bicknese" or "Bicknese") is a doctor at Ann & Robert H. Lurie Children's Hospital of Chicago. Defendant Bicknese is sued herein in her individual capacity.

50. Dr. JENNA KRUEGER Jenna Krueger ("Jenna Krueger" or "Krueger") is a doctor at Ann & Robert H. Lurie Children's Hospital of Chicago. Defendant Krueger is sued herein in her individual capacity.

51. Dr. MELISSA Cirrillo ("Melissa Cirrillo" or " Cirrillo") is a doctor at Ann & Robert H. Lurie Children's Hospital of Chicago. Defendant Cirrillo is sued herein in her individual capacity.

52. Dr. Lauren Marsillio ("Lauren Marsillio" or "Marsillio") is a doctor at Ann & Robert H. Lurie Children's Hospital of Chicago. Defendant Marsillio is sued herein in her individual capacity.

53. Dr. Rana Mafee ("Rana Mafee" or "Mafee") is a doctor at APAC Center of Pain Management. Defendant Mafee is sued herein in her individual capacity.

54. ANN & ROBERT H LURIE CHILDREN'S HOSPITAL OF CHICAGO FOUNDATION; PEDIATRICS FACULTY FOUNDATION INC; CHILDREN'S HOSPITAL OF CHICAGO MEDICAL CENTER; LURIE CHILDREN'S MEDICAL GROUP LLC are private entities who directly or indirectly employ the above doctors.

55. Hereinafter, when referred to collectively, the Defendants in paragraphs 48 through 54, inclusive, will be referred to as Medical Worker Defendants.

56. Defendants DOES 1 through 100 are sued as fictitious names, their true names, addresses and capacities being unknown to Plaintiff. When ascertained, Plaintiff will amend this Complaint by inserting their true names and capacities. Plaintiff is informed and believes and thereon alleges that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged, and

those Defendants proximately caused, are responsible for and/or legally liable for Plaintiff's damages as herein alleged. Each reference in this complaint to "Defendant," "Defendants," or a specifically named Defendant refers to and includes all Defendants sued under fictitious names. On information and belief, Plaintiff makes all allegations contained in this Complaint against all Defendants, including DOES 1 through 100.

57. Whenever in this Complaint reference is made to any act of Defendants, such allegations shall be deemed to mean all named Defendants and DOES 1 through 100, or their officers, agents, managers, representatives, employees, heirs, assignees, customers, tenants, did or authorized such acts while actively engaged in the operation, management, direction or control of the affairs of Defendants and while acting within the course and scope of their duties, except as specifically alleged to the contrary.

58. At all times herein mentioned and with respect to the specific matters alleged in this Complaint, Plaintiff is informed and believes that each Defendant (including DOES 1 through 100), was and is the agent, employee, principal, employer and/or co-conspirator of each of the remaining defendants and/or vice versa. In addition, Plaintiffs are informed and believe and on such basis allege that the defendants named hereinabove, and each of them, are responsible in some manner for the occurrences herein alleged, and that each of the above named defendants

conspired with, directed, ratified, approved, aided, abetted, and/or jointly collaborated with each of the remaining defendants in committing the acts herein alleged, and/or failed to prevent such acts when having the power and/or duty to do so, with full knowledge of said acts.

59. Plaintiffs are informed and believe and on such basis allege that each of the above named defendants was acting under color of law in committing the acts herein alleged, and that in doing the things herein alleged defendants, and each of them, were acting within the course and scope of their duties as employees or agents of each other.

## COMMON ALLEGATIONS

60. On or around Dec 10, 2014 and Jan 8, 2015, the Medical Worker Defendants and Lurie Children Hospital failed to do proper basic diagnostic testing and identify the root cause of Seizures. They failed to check levels of Magnesium, numerous Amino Acids and various toxic metals namely Lead and Mercury.

61. On or around Jan 10, 2015, Dr. Mark Wainbright told the plaintiffs "Yes, we can put the child on a Ketogenic diet or Atkins Diet. There are numerous diets which control seizures very well".

62. On Jan 21, 2015, Dr. Jenna Krueger saw minor A.T. Dr. Krueger was told that the parents have learnt that lack of Magnesium and Omega-3 can cause seizures and have started giving Magnesium and Omega-3 supplements to the child AT. Then

Dr. Krueger tried very actively to discourage plaintiffs from giving these supplements.

63. On Jan 21, 2015, Dr. Leon Epstein (Director of Lurie Children Hospital) was called by Dr. Jenna M. Krueger to convince the plaintiffs. Dr. Epstein tried to intimidate and convince very hard to start the minor AT on Keppra and told that Keppra is a very safe medicine and has no side effects. He also told the plaintiffs "Ketogenic diet does not work. It is difficult. There is no evidence it works. It is very dangerous. I or any other doctor in Lurie Children Hospital are not going to sign off."

64. Between Jan 15, 2015 and Feb 25, 2016, the plaintiffs initiated the minor AT on Ketogenic Diet on their own once they realized Ann & Robert Lurie Children Hospital is not going to help them with Ketogenic Diet.

65. Ann & Robert Lurie Children Hospital did not provide any training or education to plaintiffs on Ketogenic Diet. There was no doctor on the Ketogenic team and Lurie Ketogenic team told us on every visit that the minor AT is doing very well and asked us to continue what we have been doing.

66. Between Jan 12, 2015 and Feb 26, 2016, the plaintiffs learned about the Ketogenic diet from Dr. Freeman's book on Ketogenic diet, leading hospital websites and various other parents.

67. Between Jan 12, 2015 and Feb 25, 2016, the minor child AT was never hospitalized and exceled significantly in school and academics.

68. On or around Feb 28, 2016, various Medical Worker Defendants including Dr. Lauren E. Marsillio and unnamed Social workers employed by for Ann & Robert Lurie Hospital accused Plaintiffs of medical neglect. Defendant Ann & Lurie Children Hospital called DCFS and refused to let the child leave the child for more than one and half day even after repeated demands of the minor child AT and requests from parents. Various private actor defendants have conspired with State Actors acting color of State law and threatened and intimidated the plaintiffs.

69. Numerous Private Actor defendants made stigmatizing comments about the plaintiffs.

70. Private Actors conspired and jointly engaged with state actors to deprive the constitutional rights.

71. This unconstitutional action was compelled by the State Actors.

72. There is a close nexus between the Private Actors and State Actors for prosecuting the plaintiffs for alleged medical neglect. This was done with malice and caused

73. As per the knowledge of plaintiffs, Medical Worker Defendants are subcontracted or are employed by various private entities and subsidiaries related to Ann and Robert Lurie Children Hospital of Chicago. Some of these other entities are Pediatrics Faculty Foundation Inc., Children's Hospital of Chicago Medical

Center, Lurie Children's Medical Group LLC and few others unknown to Plaintiffs.

74. Some of the non-profit entities related to Ann and Lurie Children Hospital keep assets in offshore Cayman Islands.

75. Social Worker Defendants and State Actors who have acted under color of State law are employed by Illinois Department of Children and Family Services.

76. On Feb 28, 2016, Defendant Dr. Lauren Marsillio discharged minor child AT around 7:30 pm with instructions to have the diet with 60 gms of Carbohydrates and knowingly misled the parents. Dr. Lauren Marsillio should have known that Ketogenic Diet does not allow for this high number of carbohydrates and will cause seizures.

77. On July 04, 2016, The Department of Child and Family Services ("DCFS") indicated plaintiffs for allegation #79 (Medical Neglect).

78. On July 17th, 2016, the plaintiff emailed to all defendants more than 80 published medical papers on Ketogenic diet to all the defendants. These medical papers have been published by leading medical doctors at top Medical Universities in United States, Europe and Asia. No response from any of defendants.

79. On July 17, 2016, the plaintiff emailed to all defendants that "The minor A.T. has been complaining about headaches and being dizzy all the time. Headaches and dizziness complaint is non-stop all through the day and night. He feels tired all

the time and says that his eyes are hurting and hands are paining. He has also been getting up at night saying that there are some insects who are about to eat him. I check and show him that there are no insects but he is still not convinced. He has also been hitting others and feeling depressed. These things have started in last 15 days and it appears that it is getting worse. He started on Keppra about 17 days ago and I wonder if there is any relation." No response has been received from any of the defendants.

80.    On July 17, 2016, the plaintiff emailed 17 (numbered 1-17) questions to all the State and Private Actors in Ann & Lurie Children Hospital and DCFS Officials. There has been no response from any of the defendants. The questions were as below.

> (1) Do we know the underlying root cause of his seizures? Have you done any genetic/metabolic investigation?
>
> (2) Have any efforts been made to identify if my son's seizures are being caused by any nutritional deficiency such as B12 or B6 or any other?
>
> (3) How was it determined that this medication Keppra is the right treatment? Is Keppra better than Ketogenic diet? If yes, why?
>
> (4) Are there any double blind randomized studies which show Keppra's effectiveness in preventing status epilepticus?
>
> (5) How was the initial dosage of 1000 mg Keppra/day was determined?

(6) Can Keppra medication cause GI cancer?

(7) Can Keppra medication cause kidney damage?

(8) Can Keppra medication cause liver damage?

(9) Can Keppra medication deplete body of essential nutrients and cause more seizures?

(10) Can Keppra medication degrade cognition?

(11) Are you aware of some children dying from SUDEP who had been using Keppra for more than 2-3 years?

(12) Is classic Ketogenic diet or MCT oil diet or modified Atkins diet a medical treatment? When do you prescribe it and why?

(13) Are there any double blind randomized studies regarding effectiveness of Ketogenic diet?

(14) Do you consider MCT Ketogenic diet success if it prevented seizures for 14 months? If not, why do you consider it a failure? How does it compare to effectiveness of Keppra?

(15) Is Ketogenic diet neuroprotective?

(16) Are you aware of published 500+ medical papers showing effectiveness of Ketogenic diet in Alzheimer, Cancer, Parkinson's and numerous other neurological disorders?

(17) Do you consider using the diet for controlling seizures as medical neglect?

81.     On July 22, 2016, the plaintiff emailed another 18 questions (numbered 18-35) to all the State Actors in DCFS and Private Actors in Ann & Robert Lurie Children Hospital. There has been no response from any of the defendants. The questions were as below.

(18)  Why do all neurologists and epileptologists in Lurie Hospital hide and never provide any information to parents about Ketogenic medical diet?

(19)  If someone comes to know about it, then why does Lurie Hospital tries to actively discourage people from using the Ketogenic medical diet?

(20)  Can low levels of Magnesium and Vitamin B cause status epilepticus and seizures?

(21)  Why does Lurie Hospital doctors never test Magnesium and Vitamin B levels in any seizure patient?

(22)  Why do Lurie Hospital discourage parents from giving Magnesium and Vitamin B?

(23) Can anyone explain the precise mechanism and clinical pharmacology of how Keppra exerts its anti-epileptic effect in human models?

(24) Does Lurie Hospital know the underlying root cause of my son's seizures?

(25) How was it determined that Keppra will solve this problem?

(26) Can Lurie Hospital guarantee that he will not have any seizures on Keppra for 14 months as achieved on Ketogenic diet?

(27) Is it true that people taking Keppra are twice as likely to suffer from suicidal tendencies and thoughts as are those who have not been taking these drugs?

(28) Can Keppra cause people to become depressed and commit suicide? Have people on Keppra really committed suicides?

(29) Can Keppra cause headaches?

(30) Can Keppra cause trouble walking and make someone weaker every day?

(31) Can Keppra cause slowed speech, spaciness, behavior issues, slow reading, hesitating, interrupted speech with hum, hum in between words?

(32) Can Keppra cause loss of motor coordination?

(33) Can Keppra cause tooth decay?

(34) Can Keppra cause damage to heart, liver, kidneys?

(35) Do doctors in Lurie Hospital receive any kind of benefits or kickbacks from pharmaceutical industry or own shares of those companies? Anything

such as sponsored trips or sporting events, promotional speaking, consulting, business travel, meals, royalties and gifts.

82.     On July 24, 2016, the plaintiff Sanjay Tyagi appealed the indicated finding by sending fax to DCFS Administrative Hearings Unit at 217-557-4652. This fax confirmation and scanned appeal of indicated finding was also sent by email to all the defendants on July 24, 2016. The plaintiff did not qualify for expedited appeal of 35 days and requested a regular appeal of 90 days. DCFS is obligated to provide the final decision in the appeal within 90 days. (Lyon vs DCFS et al 2004, Supreme Court of Illinois). This request for appeal was timely filed by plaintiff Sanjay Tyagi within 60 days of receiving the DCFS letter that the report was indicated (DCFS Rule 336.40 and 336.80).

83.     On July 30, 2016, the plaintiff emailed another 9 questions to all the State Actors in DCFS and Private Actors in Ann & Robert Lurie Children Hospital. There has been no response from any of the defendants. The questions were as below.

(1) How is it medical neglect if I decide to use the final medically proven Ketogenic diet approach directly?

(2) How is it medical neglect when Ketogenic diet is used for treating seizures, epilepsy, Alzheimer, Parkinson's, Cancer, tumors and numerous other diseases? Is it my fault if most of the medical schools do not have a single course in nutrition and dietary treatments? Is it my fault if most of the Lurie Children Hospital doctors lack knowledge of latest Ketogenic dietary treatments?

(3) How is it medical neglect when I emailed everyone in Lurie Hospital and DCFS more than 80 published medical papers? I can email the remaining 500+ published medical papers also. Is it my fault if most of the doctors in Lurie Children Hospital do not read published medical papers?

(4) How is it medical neglect when Ketogenic diet prevented seizures and hospitalization for more than 14 months? Can you guarantee that your medication will prevent for even half the time (7 months)?

(5) How is it medical neglect when the kid remained active in various sports and became good at them? Believe me that he will defeat most of the doctors here in number of making basketball hoops.

(6) Has Lurie Children Hospital not done medical neglect?

> I. Never told about various available treatments. Why do the Lurie doctors never tell parents about Ketogenic diet?

II. Actively discouraged once I came to know about diet and I asked various questions. Do you discourage the Ketogenic diet since it drastically reduces the revenues of hospitals and doctors?

III. Told "Ketogenic diet does not work. It is too tough. It is harmful".

IV. Did not help at all in explaining Ketogenic medical diet.

(7) Whom should I hold responsible for the side effects, cognitive decline and Muscle weakness that my son is experiencing from Lurie Hospital forced Keppra medication?

(8) Who should I hold responsible if my son had SUDEP as a side effect of drug forced by Lurie Hospital?

(9) How is it medical neglect if it significantly improved academic performance? For the duration of one and half year in which my son remained on the diet, he became very alert and his performance increased greatly as evidenced below by school records.

84. On July 31, 2016, the plaintiff emailed published medical literature on how Ketogenic diet is used to treat Status Epilepticus to all the State Actors in DCFS and Private Actors in Ann & Robert Lurie Children Hospital and asked how does

using Ketogenic diet constitute medical neglect. There has been no response from any of the defendants.

85.  On Aug 1st, 2016, the plaintiff asked all the State Actors in DCFS and Private Actors in Ann & Robert Lurie Children Hospital has a pattern of taking away minority children on false medical neglect grounds, make them ward of state, do extensive drug experimentation without parent's approval and turn the children into a cash cow?

86.  On August 1st, 2016, the plaintiff emailed to all defendants more than 140 published medical papers on Ketogenic diet to all the State Actors in DCFS and Private Actors in Ann & Robert Lurie Children Hospital. These medical papers have been published by leading medical doctors at top Medical Universities in United States, Europe and Asia. No response from any of defendants. However, they continued to call it Medical neglect even though after provided overwhelming amount of medical evidence.

87. On August 5th, 2016, the plaintiffs emailed State Actors Mr. George Sheldon, Mr. Marko Djurisic, Mr. Lawrence Alberg, Mr. Donald Jonker, Mr. Alejandro Mateos, Mr. Rod Remolina and provided them with more than 140 published medical papers on Ketogenic Diet. These medical papers have been authored by leading medical professionals in top medical universities around the world.

88.  On August 6ᵗʰ, 2016, Mr. Rod Remolina responded that all these emails and documents have been documented in Advocacy Office. However, various state actors and private actors failed to consider these medical papers.

89.  On August 6ᵗʰ, 2016, Mr. Donald Jonker responded by email with copies to Mr. George Sheldon, Mr. Marko Djurisic, Mr. Lawrence Alberg, Mr. Donald Jonker, Mr. Alejandro Mateos, Mr. Rod Remolina and said that the plaintiffs should not send anything to Mr. George Sheldon and Mr. Marko Djurisic as it is an Ex-Parte communication. But, he failed to explain and answer my question on how it is Ex-parte communication as everyone was provided the same information at the same time and by same means of email.

90. On August 6ᵗʰ, 2016, the plaintiffs emailed Mr. George Sheldon, Mr. Marko Djurisic, Mr. Lawrence Alberg, Mr. Donald Jonker, Mr. Alejandro Mateos, Mr. Rod Remolina and told them that they and their employees are have abused their power by threatening to remove the children from the parents. These state actors were also informed that they have failed to provide the investigative file even though it was requested by plaintiffs on July 24, 2016 by phone and email. These state actors acted the color of state law and are receiving federal money based on the number of children removed from parents.

91.  On August 12ᵗʰ, 2016, the plaintiff Alka Jagatia appealed the indicated finding by sending fax to DCFS Administrative Hearings Unit at 217-557-4652. This fax

confirmation and scanned appeal of indicated finding was also sent by email to all

the defendants on August 12, 2016. The plaintiff Alka Jagatia is entitled and

requested expedited appeal of 35 days. (DCFS Rule 336.85). DCFS is obligated to

provide the final decision in the appeal within 35 days. This request for appeal was

timely filed by plaintiff Alka Jagatia within 60 days of receiving the DCFS letter

that the report was indicated (DCFS Rule 336.40 and 336.80).

92. The Department of Child and Family Services ("DCFS") indicated plaintiff Alka

Jagatia for medical neglect without having an "Administrator's Conference".

DCFS authorities knew that plaintiff Alka Jagatia is a qualified nurse who is

looking to work in a children's health clinic and is Dupuy-eligible. The plaintiff

was entitled for Administrator Conference (DCFS Rule 300.16) before indicating

her for Allegation # 79 (Medical Neglect). This was in violation of Dupuy's

lawsuit as decided by Illinois Supreme Court. An Administrator's Conference is

not like a typical hearing during which testimony is provided; rather, it is a

conversation   regarding why you should or should not be indicated.  It is

especially important to present evidence and issues that the DCFS investigator has

not considered.

93. The Department of Child and Family Services ("DCFS") exceeded the time

limits under its rules to complete the investigations. By law, the DCFS investigator

has a duty to complete the investigation within 60 days.

94. It is now a constitutional requirement that before DCFS concludes there is "credible evidence" to indicate a report, it must conduct a full investigation in which it gathers and considers both inculpatory and exculpatory evidence—that is, evidence of guilt as well as evidence of innocence. After collecting any evidence supporting the allegation and any evidence contradicting the allegation, DCFS must review all of the evidence gathered and make a decision based on that evidence. DCFS failed to gather and consider the evidence of innocence.

95. On September 22nd, 2016, Defendant DCSF Administrative Law Judge Marko Djurisic conducted a sham trial and refused to enforce the subpoena for 39 subpoenaed people who were properly served by DCFS by certified USPS mail. Plaintiffs promptly emailed the scanned subpoena letter to all these subpoenaed people as courtesy. The plaintiffs did not get the chance to question and cross examine these subpoenaed people. DCFS Judge refused to sanction these people who violated the subpoena. DCFS Judge Marko Djurisic explained that he does not have power to enforce the penalties mentioned in subpoena. DCFS Administrative Law Judge explained that the verbiage mentioned in the subpoenas "Your failure to appear in response to this subpoena is punishable by a term of imprisonment of not more than 6 months, a \$500 fine, or both and/or by an attachment for contempt as in civil cases" is just meant to scare people but he cannot really enforce it. These actions of Defendant Marko Djurisic violated rights

granted by 6th amendment of US Constitution. Sixth amendment of US
Constitution grants the right to confront and cross examine adverse witnesses and
right to compel witnesses to testify.

96.   On September 22nd, 2016, Dr. Leon Epstein refused to appear in person in front
of Defendant ALJ Marko Djurisic. He was with an external attorney and testified
via phone. He explained that he has been a practicing neurologist for last 30+
years and he has been managing Lurie Children's Hospital Epilepsy program for
last 17 years. He said that he did not study any course on Ketogenic diet in his
medical degree. He was asked if he has published any medical papers on
Ketogenic diet in medical journals and seemed irritated at the question and finally
answered that he has not published any medical papers on Ketogenic diet. Dr.
Leon Epstein could not answer what medical differential diagnosis steps were
taken by him and other doctors at Ann & Lurie Children Hospital to identify the
cause of Status Epilepticus in my son. He also could not answer if Lurie
Children's Hospital tested Vitamin B12, B6 and Carnitine levels at the time of the
Status Epilepticus. He also could not tell if the he or the hospital did a Liver
Function Test, microbiological test, hematological studies, amino acid and organic
acid measurements. However, he said that he does not think that is the cause of
Status Epilepticus but failed to explain the rationale of his thinking. He said that
he did not prescribe Keppra and could not tell who prescribed the Keppra

medication. He also said that he did not call DCFS. When asked if he could guarantee that Keppra or any other AED will prevent Status Epilepticus in next 3 months, Dr. Leon Epstein said that he cannot guarantee that Status Epilepticus will not happen with Keppra or any other AED. He was also not aware of a medical paper written by Dr. Jenna Krueger and Dr. Mark Wainwright "A treatable metabolic cause of encephalopathy: cobalamin C deficiency in an 8-year-old male." and "Venous stroke and status epilepticus due to milk-induced anemia in a child". Dr. Leon Epstein was also not aware and had not read numerous published medical papers on the treatment of status epilepticus, refractory status epilepticus, super refractory status epilepticus using Ketogenic diet. Dr. Leon Epstein became very upset when asked about the fact that the neurologists in Lurie Children's Hospital have hardly published any medical papers on Ketogenic diet. Dr. Leon Epstein acknowledged that Ketogenic diet is a medical treatment. However, he continued to insist that the parental actions constitute medical neglect even though he has received 500+ Ketogenic Diet published medical papers from the defendants.

97.    On September 22nd, 2016, Dr. Alma Bicknese refused to appear in person in front of Defendant ALJ Marko Djurisic. She was with an external attorney and testified via phone. Dr. Alma Bicknese explained that she has met my son only one time in her office, but did mention that she spoke to the parents over the phone

on several occasions. She also said that she did not study any course on Ketogenic diet in her medical degree. Dr. Alma Bicknese was asked if she has published any medical papers on Ketogenic diet in medical journals and she replied that she has not published any papers. Dr. Alma Bicknese also could not answer what differential diagnosis steps were taken by Lurie Children Hospital to identify the cause of Status Epilepticus in my son. She also could not answer if she and other doctors at Ann & Lurie Children Hospital tested Vitamin B12, B6, Carnitine levels. Liver Function Test, microbiological test, hematological studies, amino acid and organic acid measurements at the time of the Status Epilepticus. Dr. Alma Bicknese explained that she became involved with my son's care recently and she does not know past history. Dr. Alma Bicknese confirmed that she is aware of the various Keppra side effects experienced by my son – aggressive behavior, memory loss, blurred vision and muscle weakness and decreased coordination in walking and running. Dr. Alma Bicknese said that she had not prescribed Keppra. She said that she did not call DCFS. When asked if she could guarantee that Keppra or any other AED will prevent Status Epilepticus in next 3 months, Dr. Alma Bicknese said that she cannot guarantee that Status Epilepticus will not happen with Keppra or any other AED. Dr. Alma Bicknese was also not aware or had read numerous published medical papers on the treatment of status epilepticus, refractory status epilepticus, super refractory epilepticus using

Ketogenic diet. Dr. Alma Bicknese acknowledged that Ketogenic diet is a medical treatment. However, Dr. Alma Bicknese continued to insist that the parental actions constitute medical neglect even though he has received 500+ Ketogenic Diet published medical papers from the defendants.

98.     On September 22nd, 2016, Dr. Rana Mafee refused to appear in person in front of Defendant ALJ Marko Djurisic. She testified via phone. Dr. Rana Mafee said that she did not study any course on Ketogenic diet in her medical degree. Dr. Rana Mafee also informed that she has not published any medical papers on Ketogenic diet in medical journals. Dr. Rana Mafee said that she wanted to treat at a holistic level in finding the root cause of my son's seizures and asked the parents to work simultaneously with another child neurologist. Dr. Rana Mafee said that she has not prescribed Keppra medication and the side effects experienced by my son means that this medication is not working. She said that she has not conducted any diagnostic tests and neither has seen any other diagnostic tests. Dr. Rana Mafee could only explain working of Ketogenic diet at a superficial level. When probed in detail, she could not explain how the Ketogenic Diet really works. Dr. Rana Mafee said that she had not prescribed Keppra. She said that she did not call DCFS. When asked if she could guarantee that Keppra or any other AED will prevent Status Epilepticus in next 3 months, Dr. Rana Mafee said that she cannot guarantee that Status Epilepticus will not happen with Keppra or any other AED.

Dr. Rana Mafee was also not aware and had read numerous published medical papers on the treatment of status epilepticus, refractory status epilepticus, super refractory epilepticus using Ketogenic diet. Dr. Rana Mafee said that Ketogenic diet is not a medical treatment but did not explain the rationale. However, Dr. Rana Mafee continued to insist that the parental actions constitute medical neglect even though she has received 500+ Ketogenic Diet published medical papers from the defendants.

99. The defendants were informed numerous times by plaintiffs that the prescribed drug Keppra contains various inactive ingredients such as colloidal silicon dioxide, croscarmellose sodium, magnesium stearate, polyethylene glycol 3350, polyethylene glycol 6000, polyvinyl alcohol, talc, titanium dioxide, FD&C Blue #2/indigo carmine aluminum lake, iron oxide yellow, FD&C yellow #6/sunset yellow FCF aluminum lake, iron oxide red, ammonium glycyrrhizinate, citric acid monohydrate, glycerin, maltitol solution, methylparaben, potassium acesulfame, propylparaben, purified water, sodium citrate dihydrate and natural and artificial flavor. Many of these ingredients such as Aluminium and Titanium and various artificial colors are known as Neurotoxins and cause death of brain neurons. However, the defendants continued to ignore the scientific information provided by Plaintiffs.

100.     The defendants were informed by Plaintiffs that on September 15th, 2016,

European Medicines Agency (EMA) Committee for Medicinal Products for

Human Use (CHMP) has scientifically concluded that Levetiracetam causes acute

kidney injury, musculoskeletal and connective tissue disorders and

Encephalopathy {Procedure No. EMEA/H/C/PSUSA/00001846/201511}.

However, the defendants continued to ignore the scientific information provided

by Plaintiffs.

101.     On September 23, 2016 at 10:52 am, Plaintiffs emailed the list of side

effects (from the FDA website and Drugs.com) to all the defendants. Some of the

common side effects are infection, psychoneurosis, drowsiness, weakness,

headache, nasopharyngitis, nervousness, abnormal behavior, aggressive behavior,

agitation, anxiety, apathy, depersonalization, depression, fatigue, hostility,

hyperkinesia, personality disorder, emotional lability, irritability, laceration, and

mood changes. Other side effects include: **tonic clonic seizure**, **dizziness, vertigo**,

decreased neutrophils, depressed mood, neck pain, and pain. The plaintiffs also

asked Dr. Leon Epstein the following questions.

        (A)     Do you have any conflict of interest?  Have you accepted any

                form of payment or benefit directly or indirectly from pharma

                companies in your medical career?

(B)     Do you hold any investments in these companies? Does any

of the doctors working under you have received payments or benefits

directly or indirectly from pharma companies?

(C)     Do you or your doctors accept lunches that are paid by

pharmaceutical companies

(D)     Are there any other benefits that are not captured or reported?

102.    On Sept 23, 2016 at 10:52 am, Plaintiffs provided all the defendants the

money received by Ann & Lurie Children Hospital and doctors from the UCB Inc.

(manufacturer of Keppra)

    A.  Money provided by UCB Inc. -   $2,732,721.75 + $161,735.56 in 2015

    B.  Money received by Lurie Hospital - $4,182,565.51+$2,481,687.41

       (2015)

    C.  Money provided by UCB GmBH- $1,021,946.26   + $122,001.75 (2015)

    D.  Money received by Lurie Hospital from UCB GmBH -  $13404.60

       (2015)

103.    On September 28, 2016, Plaintiffs emailed and informed Medical Worker

Defendants and Social Worker Defendants including Dr. Leon Epstein and Dr.

Alma Bicknese that they have wrongly diagnosed and this was evident from the

facts that Genetic Epilepsy Panel Test did not reveal anything. The gene variants in Gene NRXN1, SCN9A and POLG are benign and of unknown significance. Another 24 hrs. EEG Test done on 24th September clearly revealed that there is no slow wave activity, no eleptiform activity and there are no abnormal patterns. All of his past seizures have been provoked seizures (1) Strep throat (2) Persistent diarrhea for 15-20 days (3) high fever (4) Overheated and dehydration while playing basketball. This does not even fit the definition of Epilepsy. Epilepsy is defined as more than one unprovoked seizure. The prescribed medication Keppra on FDA website lists tonic clonic seizures as a side effect. Dr. Epstein called Keppra a very safe medication while calling Ketogenic diet as very dangerous.

104.    On or around Sept 28, 2016, the school Principal Mrs. Mary Cunat complained to Plaintiffs about the aggressive behavior changes in minor AT in last one month and it was immediately informed to all Medical Worker Defendants and Social Worker Defendants. However, they failed to take any action.

105.    On October 6, 2016, the Plaintiffs emailed Dr. Leon Epstein the following questions and copied to Medical Worker Defendants and Social Worker Defendants. No answers have been provided till date.

(A)    Is Lurie Children Hospital a non-profit organization under Section 501(c)(3)?

(B)   Why does Lurie Hospital keep money in tax haven Cayman Islands and foreign corporations? Is it not being unpatriotic to your country and the children of your country? Do you see any conflict of interest while having a non-profit status?

(C)   Did your President Mr. Patrick Magoon receive $ 1,768,759 in 2013? (close to 2 million dollars' salary in a nonprofit organization)

(D)   Did your President Mr. Patrick Magoon receive $ 496,545 in other payments?

(E)   Did you receive $349,232 in 2013 from Lurie Foundation?

(F)   Did you receive $25, 500 in 2013 in other payments? Do you receive payments from drug companies?

(G)   Did Lurie Hospital spend $ 494,313 in 2013 for direct contact with govt officials?

106.     Plaintiffs prevented any status epilepticus episodes for 14 months using Ketogenic Diet while Medical Worker Defendants including Dr. Leon Epstein, Dr. Alma Bicknese and other doctors at Ann & Lurie Children Hospital have refused to guarantee that the minor child A.T will not have another status epilepticus in next 3 months once put on Keppra.

107.     On November 3rd, 2016, Plaintiffs emailed Medical Worker Defendants and Social Worker Defendants including Dr. Leon Epstein and asked if he is aware

that the suppressing of Sodium channels by Keppra can cause Sudden Death SUDEP. Does he know the detailed workings of voltage gated Calcium, Sodium, Potassium, CNG and HCN ion channels in the human brain neural network? No response has been provided.

108.    These excerpts have been taken from "DEATH BY MEDICINE" authored by Dr. Martin Feldman, Dr. Debora Rasio, Dr. Dorothy Smith, DR. Carolyn Dean and Dr. Gary Null.

    (A)    Dr. Richard Besser, of the CDC, in 1995, said the number of unnecessary antibiotics prescribed annually for viral infections was 20 million. Dr. Besser, in 2003, now refers to tens of millions of unnecessary antibiotics.2,2a The number of unnecessary medical and surgical procedures performed annually is 7.5 million. The number of people exposed to unnecessary hospitalization annually is 8.9 million. The total number of iatrogenic deaths shown in the following table is 783,936. It is evident that the American medical system is the leading cause of death and injury in the United States.

## TEN-YEAR STATISTICS FOR UNNECESSARY INTERVENTION

| Unnecessary Events | 10-year Number | Iatrogenic Events |
|---|---|---|
| Hospitalization | 89 million[4] | 17 million |
| Procedures | 75 million[3] | 15 million |
| **TOTAL** | **164 million** | |

These projected figures show that in 2003, a total of 164 million people, approximately 56% of the population of the United States, have been treated unnecessarily by the medical industry – in other words, about 50,000 people per day.

(B) As few as 5% and only up to 20% of iatrogenic acts are ever reported. This implies that if medical errors were completely and accurately reported, we would have a much higher annual iatrogenic death rate than 783,936. Dr. Leape, in 1994, said his figure of 180,000 medical mistakes annually was equivalent to three jumbo-jet crashes every two days. Our report shows that 6 jumbo jets are falling out of the sky each and every day.

(C) In 1995, a report in JAMA said that, "Over a million patients are injured in U.S. hospitals each year, and approximately 280,000 die annually as a result of these injuries. Therefore, the iatrogenic death rate dwarfs the annual automobile accident mortality rate of 45,000 and accounts for more deaths than all other accidents combined."

(D) At a press conference in 1997, Dr. Leape released a nationwide poll on patient iatrogenesis conducted by the National Patient Safety Foundation (NPSF), which is sponsored by the American Medical Association. The survey found that more than 100 million Americans

have been impacted directly and indirectly by a medical mistake. Forty-two percent were directly affected and a total of 84% personally knew of someone who had experienced a medical mistake. Dr. Leape at this press conference also updated his 1994 statistics saying that medical errors in inpatient hospital settings nationwide, as of 1997, could be as high as three million and could cost as much as $200 billion. Leape used a 14% fatality rate to determine a medical error death rate of 180,000 in 1994.16 In 1997, using Leape's base number of three million errors, the annual deaths could be as much as 420,000 for inpatients alone. This does not include nursing home deaths, or people in the outpatient community dying of drug side effects or as the result of medical procedures.

109.    On November 7th, 2016, Plaintiffs emailed Defendant DCFS Director George Sheldon and Social Worker Defendants and numerous DCFS Officials acting under the color of State law that they have exceeded the deadline to issue the final administrative decision and requested them to dismiss the case. "As stated numerous times before by email and phone, we have not waived any of the rights under Lyon. (Lyon v. DCFS and Dupuy are Illinois Supreme Court decisions (in 2004) that requires DCFS to provide final administrative decision in

the appeal within 90 days (Regular Appeal) and 35 days (Expedited Appeal) of the date that DCFS receives the appeal request.)

  (A) Plaintiff 1 (Sanjay) - Regular Appeal faxed to DCFS and emailed on July 24, 2016. 90 days' deadline expired on Oct 22, 2016.

  (B) Plaintiff 2 (Alka) - Expedited Appeal faxed to DCFS and emailed on August 12, 2016. 35 days' deadline expired on Sept 16, 2016.

110.     On November 10th, 2016, Defendant Illinois DCFS Director issued his final administrative decision. This was on 110th day (for Plaintiff Sanjay Tyagi) and on 91st day (for Plaintiff Alka Jagatia) after receiving the appeal. DCFS was obligated to provide the final decision in the appeal within 90 days. (Lyon vs DCFS et al 2004, Supreme Court of Illinois). The plaintiffs have reminded DCFS Director, DCFS Administrative Law Judge, DCFS Litigation counsel and others multiple times that the plaintiffs will not waive this 90-day deadline.

111.     All of the actions of Defendants, their officers, agents, employees, and servants were performed, and continue to be performed, under the color and pretense of the policies, statutes, ordinances, regulations, customs, and usages of the State of Illinois.

112.    Plaintiffs have been damaged by Defendants' actions under color of State

law.

113.    Unless Defendants are enjoined from enforcing arbitrary actions, Plaintiffs

will continue to suffer irreparable harm to their federal constitutional rights.

## LEGAL ARGUMENT

114.    The plaintiffs incorporate by reference all preceding allegations.

115.    The State Central Register records all cases of suspected child abuse or

neglect processed by the Department under the Act. 325 ILCS 5/7.7 (West 1998).

The Department investigates all reports and finds them to be "indicated,"

"unfounded," or "undetermined."   325 ILCS 5/7.12 (West 1998).   An "indicated

report" is a report of abuse or neglect that investigation reveals is supported by

credible evidence.   325 ILCS 5/3 (West 1998); 89 Ill. Adm.Code § 300.20

(2002).   "Credible evidence" means that "the available facts, when viewed in light

of the surrounding circumstances, would cause a reasonable person to believe that

a child was abused or neglected." 89 Ill. Adm.Code § 300.20 (2002).

116.    Department uses the credible-evidence standard to support an indicated

finding, then it must strictly comply with applicable statutory and regulatory

deadlines in adjudicating the subject's administrative appeal to provide the subject

due process.

117.     SEVERAL ACTIONS BY THE STATE ACTORS OF ILLINOIS

DEPARTMENT OF CHILDREN AND FAMILY SERVICES VIOLATED THE

DUE PROCESS RIGHTS OF PLAINTIFFS, including: (1) the use of the

credible-evidence standard of proof to support the indicated finding and the denial

of first-stage appeal; (2) the failure to provide timely disclosure of the

investigative file and the failure to turn over the complete file; and (3) the

violation of statutory and regulatory deadlines concerning the investigation, the

indicated finding, the hearing, and the issuance of the Director's decision.

118.     THE INDICATED FINDINGS WERE AGAINST THE MANIFEST

WEIGHT OF THE EVIDENCE PROVIDED TO Medical Worker Defendants and

Social Worker Defendants BY THE PLAINTIFFS. This evidence consisted of

more than 500 published medical papers (more than 6000 pages) authored by top

medical doctors at top universities in USA, Europe and Asia. These published

medical papers prove that Ketogenic Diet is a medical intervention and is used to

treat seizures and status epilepticus.

119.     DEFENDANT CHIEF ADMINISTRATIVE LAW JUDGE

ARBITRARILY AND UNILATERALLY DECIDED TO DENY 35 DAY

EXPEDITED ADMINISTRATIVE HEARING FOR ONE OF THE PLAINTIFFS

WHO WAS CLEARLY ENTITLED TO IT. No information about the reasons for

denial was provided to the Plaintiff. This was done in violation of the judgement

(Lyon vs DCFS et al 2004, Supreme Court of Illinois).

120.     DEFENDANT ADMINISTRATIVE LAW JUDGE MR. MARKO

DJURISIC KNOWINGLY FALSELY STATED UNDER OATH IN HIS

FINDINGS OF FACT THAT THE MINOR AT HAS BEEN DIAGNOSED

WITH ASTHMA. The fact is that the minor AT does not have asthma and he has

never been diagnosed with Asthma. The defendant Mr. Marko Djurisic has

committed Perjury, a class 3 felony (720 ILCS 5/32-2).

121.     DEFENDANT ADMINISTRATIVE LAW JUDGE MR. MARKO

DJURISIC KNOWINGLY FALSELY STATED UNDER OATH IN HIS

FINDINGS OF FACT THAT THE MINOR AT HAS BEEN DIAGNOSED

WITH ASTHMA. The fact is that the minor AT does not have asthma and he has

never been diagnosed with Asthma. The defendant Mr. Marko Djurisic has

committed Perjury, a class 3 felony (720 ILCS 5/32-2)

122.     DEFENDANT ADMINISTRATIVE LAW JUDGE MR. MARKO

DJURISIC FALSELY STATED UNDER OATH IN HIS FINDINGS OF FACT

THAT THE MINOR AT WAS PLACED IN A MEDICALLY INDUCED COMA

ON OR ABOUT FEBRUARY 27, 2016. The fact is that the minor AT has never

been placed in medically induced coma. The defendant Mr. Marko Djurisic has

committed Perjury, a class 3 felony (720 ILCS 5/32-2).

123.    DEFENDANT ADMINISTRATIVE LAW JUDGE MR. MARKO

DJURISIC AND DR. LEON EPSTEIN KNOWINGLY FALSELY STATED

UNDER OATH IN THE FINDINGS OF FACT THAT ANN & LURIE

CHILDREN HOSPITAL HAS THE SECOND LARGEST KETOGENIC DIET

PROGRAM. The fact is that their Ketogenic Diet program is not even among the

first ten in the country and it does not come within first two in Chicago itself.

Defendants Mr. Marko Djurisic and Dr. Leon Epstein has committed Perjury, a

class 3 felony (720 ILCS 5/32-2)

124.    Defendant Dr. Leon Epstein defined the definition of Epilepsy as two or

more unprovoked seizures without any underlying cause. DEFENDANT DR.

LEON EPSTEIN FAILED TO EXPLAIN HIS REASONING AS HOW HE

DIAGNOSED IT TO BE EPILEPSY SINCE EVERY HOSPITALIZATION

WAS PROVOKED BY STREP THROAT AND SUDDEN FEVER.

125.    DEFENDANT DR. LEON EPSTEIN AND OTHER DEFENDANTS

FAILED TO REVEAL THE AMOUNT OF MONEY RECEIVED BY THEM

FROM UCB INC (MAKERS OF KEPPRA). On July 13, 2011, UCB Inc. has

criminally pled guilty in Federal courts and paid civil fines to Federal government.

126.    Defendant Administrative Law Judge Mr. Marko Djurisic and Dr. Epstein

falsely stated under oath in the findings of fact that Keppra has a very low risk of

side effects.

127.    DEFENDANT ADMINISTRATIVE LAW JUDGE MR. MARKO
        DJURISIC FAILED TO ENFORCE 38 SUBPOENAS AND REFUSED TO
        COMPEL WITNESSES TO APPEAR and answer questions under oath.

128.    DEFENDANTS HAVE FAILED TO SHOW ANY HARM TO THE
        CHILD BY FOLLOWING KETOGENIC DIET.

129.    PRIVATE ACTOR DEFENDANTS AND STATE ACTOR ACTING
        UNDER COLOR OF STATE LAW HAVE FAILED TO SHOW THAT THEIR
        TREATMENT APPROACH IS BETTER THAN THE MEDICALLY PROVEN
        KETOGENIC DIET.

130.    The administrative law judge shall issue the recommendation to the
        Director within 90 days of the request for the hearing, and the DCFS Director
        must issue his final decision accepting or rejecting the administrative law judge's
        recommendation within the same 90–day period.   89 Ill. Adm.Code §  336.220(a)
        (2002).

131.    THE FINAL ADMINISTRATIVE DECISION WAS LEGALLY
        ERRONEOUS AS THE MINOR WAS RECEIVING THE MEDICALLY AND
        SCIENTIFICALLY PROVEN KETOGENIC DIET WHICH IS USED AT
        LEADING HOSPITALS AROUND THE WORLD TO TREAT SEIZURES AND
        STATUS EPILEPTICUS.

132.     THE FINAL ADMINISTRATIVE DECISION CONSTITUTED A

DENIAL OF DUE PROCESS AND A VIOLATION OF THE ILLINOIS

ADMINISTRATIVE PROCEDURE ACT (5 ILCS 100/1-1 ET SEQ. (WEST

2012)), where it was arbitrary and capricious.

133.     THE FINAL ADMINISTRATIVE DECISION WAS ISSUED AFTER 90

DAYS OF THE APPEAL REQUEST. DCFS WAS OBLIGATED TO PROVIDE

THE FINAL DECISION IN THE APPEAL WITHIN 90 DAYS. (LYON VS

DCFS ET AL 2004, SUPREME COURT OF ILLINOIS).

134.     Pursuant to the Administrative Review Law (735 ILCS 5/3–101 et seq.

(West 2002)) as permitted by the Act.   325 ILCS 5/7.16 (West 1998), the

plaintiffs seek judicial review.

## FIRST CLAIM FOR RELIEF

## FOR VIOLATION OF FEDERAL CIVIL RIGHTS (42 U.S.C. § 1983)

## COUNT 1

**(Violation of free exercise of religion guaranteed by First Amendment to the United States constitution; By All Plaintiffs Against Social Worker Defendants; Medical Worker Defendants; and DOES 1 through 100, Inclusive)**

135.     Plaintiffs re-allege, and to the extent applicable, incorporates herein as if set in full, each of the foregoing paragraphs.

136.     Defendants' Policy and actions under the color of state law violate Plaintiffs' right to the free exercise of religion, as guaranteed by the First and Fourteenth Amendments to the United States Constitution.

137.     Defendants, and each of them, had, at all times relevant herein, an affirmative duty and obligation to recognize and conduct themselves in a manner that confirms, provides for, and does not violate the protections guaranteed to Plaintiffs under the United States Constitution.

138.     Defendants, and each of them, were acting under color of state law when they acted, or knew and agreed and thereby conspired, to violate Plaintiffs' civil rights.

139.     Our family's personal religious beliefs prohibit the injection of foreign substances into our bodies. Furthermore, the God teaches that we shall keep the blood pure, and keep the seed from being mixed with artificial harmful substances such as polyethylene glycol 3350, polyethylene glycol 6000, polyvinyl alcohol, talc, titanium dioxide, FD&C Blue #2/indigo carmine aluminum lake, iron oxide yellow, FD&C yellow #6/sunset yellow FCF aluminum lake, iron oxide red. When the artificial harmful substances are forced on a human being, the blood gets

contaminated, and genetic changes occur. God warned not to do this. To do so would violate these teachings of the God.

140.    Plaintiffs' personal religious beliefs are sincerely and deeply held.

141.    Defendants have failed or refused to accommodate Plaintiffs' sincerely-held religious beliefs.

142.    Defendants have violated Illinois Consolidated Statutes, Chapter 325 § 5/3. "A child shall not be considered neglected or abused for the sole reason that such child's parent or other person responsible for his or her welfare depends upon spiritual means through prayer alone for the treatment or cure of disease or remedial care."

143.    The forcible acts of state actor and private actor defendants have violated Plaintiffs' personal religious beliefs including our obedience to God's law.

144.    Defendants' violation of Plaintiffs' rights to freedom of religion beliefs has caused and will continue to cause Plaintiffs to suffer undue and actual hardship and irreparable injury.

145.    Plaintiffs have no adequate remedy at law to correct the continuing deprivations of its most cherished constitutional liberties.

146.    As a direct and proximate result of Defendants' continuing violations of Plaintiffs' rights, Plaintiffs have suffered in the past, and will continue to suffer in

the future, direct and consequential damages, including but not limited to, the loss of the ability to exercise its constitutional rights.

147.    As the direct and proximate result of the Social Worker Defendants and Medical Worker Defendants actions and DOES 1 through 100, Plaintiffs have suffered, and will continue to suffer, physical, mental, and emotional and financial injury, all to an extent and in an amount subject to proof at trial. Plaintiffs have also incurred, and will continue to incur, attorney fees, costs and expenses, to an extent and in an amount subject to proof at trial.

## COUNT 2

**(Familial Association / Right to Be Free from Dishonesty of Public Employees in DCFS Court Proceedings, i.e. Perjury, Fabrication of Evidence, Suppression of Exculpatory Evidence; By All Plaintiffs Against Social Worker Defendants; Medical Worker Defendants; and DOES 1 through 100, inclusive)**

148.    Plaintiffs re-allege, and to the extent applicable, incorporates herein as if set in full, each of the foregoing paragraphs.

149.    Plaintiffs are informed and believe and thereon allege that, at all times relevant herein, there existed a clearly established due process right not to be subjected to false accusations on the basis of false evidence that was deliberately

fabricated by the government, such that a reasonable social services agent in

Defendants' situation would know it is unlawful to lie, fabricate evidence, and/or

suppress material exculpatory evidence in court reports or any other document

filed with the DCFS court to influence judicial decision making.

150.    In fact, Defendants, and each of them, had the affirmative and self-evident

duty to be truthful, accurate, and complete in petitions, reports, and documents

submitted to a Court with power to adjudicate substantial decisions and to refrain

from using improper and deceptive means to obtain judicial sustention of

recommendations seeking to disparage Plaintiffs' interests.

151.    In doing the things alleged hereinabove, Defendants, and each of them,

were acting under color of state law when they acted, or knew and agreed and

thereby conspired, to knowingly present false allegations, false or coerced

testimony, fabricated evidence, and/or suppress exculpatory evidence, before the

DCFS Court, thereby violating Plaintiffs' rights found in the First and Fourteenth

Amendment to the United States Constitution and breaching their duty to

Plaintiffs.

152.    As a direct and proximate result of these Defendants' violations, and in

accordance with 42 U.S.C. § 1983, Plaintiffs' civil rights have been violated in that

he has suffered, and will continue to suffer, general and special damages in an

amount not yet ascertained but which shall be shown according to proof at trial.

153.    The wrongful and despicable conduct of Social Worker Defendants,

Medical Worker Defendants and each of them, as herein alleged was intentional,

done with malice, oppression, or fraud, with a callous or reckless indifference to

the rights of Plaintiffs, or motivated by an evil intent, such that Plaintiffs are

entitled to recover punitive damages in accordance with law and subject to proof

at trial.

## COUNT 3

**(Violation of Freedom of choice of medical treatment guaranteed by First**

**Amendment to the United States constitution; By All Plaintiffs Against Social**

**Worker Defendants; Medical Worker Defendants; and DOES 1 through 100,**

**Inclusive)**

154.    Plaintiffs re-allege, and to the extent applicable, incorporates herein as if set

in full, each of the foregoing paragraphs.

155.    Defendants' Policy and actions under the color of state law violate

Plaintiffs' right to the free exercise of choice of medical treatment, as guaranteed

by the First and Fourteenth Amendments to the United States Constitution.

156.    Social Worker Defendants and Medical Worker Defendants were provided

more than 500 published medical papers on medical intervention Ketogenic Diet.

These medical papers have been published at the leading universities in United States, Europe and Asia. This ketogenic diet has been used to successfully treat Seizures, Epilepsy, Cancer, Parkinson's, Alzheimer and numerous other neurological issues. There has been no response from Defendants.

157. Medical Worker Defendants serve as consultants to the pharmaceutical industry and this has caused potential conflict of interest.

158. On numerous occasions, various Social Worker Defendants and Medical Worker Defendants (state actor and private actor) have acted under color of state law and conspired to dismiss Ketogenic Medical Diet as "It does not work. There is no evidence it works. It is too difficult". Dr. Leon Epstein has been very vocal about it even though he has not done research or published any medical papers on Ketogenic Diet.

159. None of the private actor defendants included in this action have published even one paper on medical Ketogenic Diet. Private Actor defendants have no experience nor financial incentive to provide any help to patients in using Ketogenic Diet treatment. As a matter of fact, Defendant Ann & Robert Lurie Children Hospital and various private actor defendants are fearful of losing money if people started using Ketogenic diet.

160.     All defendants have been aware that the minor AT's academic performance increased by more than 300% during the period he remained on the medical Ketogenic Diet.

161.     Defendants will not provide any guarantees that their prescribed medication will prevent Status Epilepticus and sudden death SUDEP in minor AT. The defendants are aware and know that these medications block the gated Sodium, Potassium, Magnesium and Calcium ion gated channels. This blocking causes memory loss and reduced inter-neural communication and it contributes to sending weaker signals to heart. This causes slowing of heart rate and causes Bradycardia and finally Sudden Death SUDEP within few years.

162.     There have been lot of cases in which children have died of SUDEP even though they were receiving numerous medications over many years. Plaintiffs have reason to believe that many children have died of SUDEP while under treatment of the defendants at Ann & Lurie Children Hospital.

163.     Defendants are aware that they have failed to do due diligence in identifying the cause of Seizures. They have caused more illness by forcing harmful pharmaceutical drug on the minor AT.

164.     Defendants have done MRI Test and it came back completely normal.

165.     Defendants did the Epilepsy Genetic Panel Test and it has failed to reveal any gene known to cause seizures.

166.     The most recent twenty-four-hour EEG test done has come back completely normal. It says that there is no seizure activity.

167.     On each and every occasion, Defendants have refused to answer even simple questions of Plaintiffs. They have failed to acknowledge that they have prescribed a drug to minor AT which have harmed him greatly.

168.     The state and private actors under color of state law have used the coercive power of State to force Plaintiffs in depriving and violating the freedom of choice of the medical treatment.

169.     The forcible acts of state actor and private actor defendants have violated Plaintiffs' freedom of choice of the medical treatment.

170.     Defendants' violation of Plaintiffs' rights to freedom of choice of medical treatment has caused and will continue to cause Plaintiffs to suffer undue and actual hardship and irreparable injury.

171.     Plaintiffs have no adequate remedy at law to correct the continuing deprivations of its most cherished constitutional liberties.

172.     As a direct and proximate result of Defendants' continuing violations of Plaintiffs' rights, Plaintiffs have suffered in the past, and will continue to suffer in the future, direct and consequential damages, including but not limited to, the loss of the ability to exercise its constitutional rights.

173.     As the direct and proximate result of the Social Worker Defendants and

Medical Worker Defendants actions and DOES 1 through 100, Plaintiffs have

suffered, and will continue to suffer, physical, mental, and emotional and financial

injury, all to an extent and in an amount subject to proof at trial. Plaintiffs have

also incurred, and will continue to incur, attorney fees, costs and expenses, to an

extent and in an amount subject to proof at trial.

## COUNT 4

**(Violation of Unlawful Search and Unlawful seizure guaranteed by Fourth**

**Amendment to the United States constitution; Familial Association, Privacy,**

**Warrantless Seizure of Child/Unlawful Detention; By All Plaintiffs Against Social**

**Worker Defendants; Medical Worker Defendants; and DOES 1 through 100,**

**Inclusive)**

174.     Plaintiffs re-allege, and to the extent applicable, incorporates herein as if set

in full, each of the foregoing paragraphs.

175.     Plaintiffs right to be secure in their persons, houses, papers, and effects,

against unreasonable searches and seizures, shall not be violated, and no Warrants

shall issue, but upon probable cause, supported by Oath or affirmation, and

particularly describing the place to be searched, and the persons or things to be seized is protected by the Fourth Amendment to the United States Constitution.

176.     As to Plaintiff, A.T., Defendants also violated his civil rights by failing to adhere to the requirements of the Fourth Amendment of the United States Constitution when they seized, detained, questioned, threatened, examined, and/or searched A.G. without the consent of him or his parents, and without obtaining a prior court order or authorizing warrant. Again, no exigent circumstances existed, which might excuse said failure to obtain parental consent or a court order prior to seizure.

177.     Around March 2016 and May 2016, Defendant DCFS Child Investigators Marisol Rubio, Sylvia Torres Stephens and Eraina Ross Burleson went to the minor Child AT's school and interviewed him without parental knowledge and consent. The minor child AT was removed from the class and brought to a room and asked intrusive questions by the defendants. They forced minor AT to answer questions and inspected the child's body. Parents of the child were not informed and this was done without consent of parents. The child did not know Marisol Rubio, Sylvia Torres Stephens and Eraina Ross Burleson. These defendants have illegally accessed the minor children AT and RT at school without permission of parents.

178.    Chicago Public Schools allowed the defendant DCFS Child Investigators to interview the minor child AT without parental notification or consent. The minor child AT was seized for extended questioning.

179.    School Principal Mrs. Mary Cunat and School Social Worker did not give offer the minor child AT an opportunity to call his parents.

180.    School Principal and School Social Worker and DCFS Investigators did not tell the child that he was free to leave and not answer the questions.

181.    The doors to the room were closed and he was subjected to 15 to 20 minutes of intimate questioning.

182.    School Social Worker and Child Investigators told the child AT that it was ok to answer the questions of the adult strangers from DCFS child Investigators.

183.    The minor child AT was asked numerous intrusive questions about himself and his parents.

184.    These acts of defendants at school violated constituted illegal seizure of children, invasion of privacy and substantive due process rights of the parents.

185.    On two different occasions, Defendants Marisol Rubio and Eraina Ross Burleson threatened to take minor child AT and RT from the biological parents unless they were allowed inside the home immediately to do the strip search on the children. The defendants did not have the permission of parents to enter the home of the plaintiffs and the consent was obtained under the threat of taking children.

COMPLAINT FOR DAMAGES – PAGE 64 OF 91

186.     Defendants Marisol Rubio and Eraina Ross Burleson pulled down the pants

and underwear of minor child AT and RT and inspected the child's body. This was

done without seeking the parental consent and constituted illegal seizure and

invasion of privacy.

187.     Defendants Sylvia Torres Stephens and Eraina Ross Burleson said that the

minor children are eating fruits and vegetables only.

188.     Defendants Marisol Rubio, Sylvia Torres Stephens and Eraina Ross

Burleson behaved in rude and unprofessional manner.

189.     The state and private actors under color of state law have used the coercive

power of State to force Plaintiffs in depriving and violating the freedom to be

secure in their persons, houses, papers, and effects, against unreasonable searches

and unlawful seizures.

190.     The forcible acts of state actor and private actor defendants have violated

Plaintiffs' freedom to be secure in their persons, houses, papers, and effects,

against unreasonable searches and unlawful seizures.

191.     Defendants' violation of Plaintiffs' rights to freedom to be secure in their

persons, houses, papers, and effects, against unreasonable searches and unlawful

seizures has caused and will continue to cause Plaintiffs to suffer undue and actual

hardship and irreparable injury.

192.     Plaintiffs have no adequate remedy at law to correct the continuing
deprivations of its most cherished constitutional liberties.

193.     As a direct and proximate result of these Defendants' misconduct, Plaintiffs
have suffered, and will continue to suffer, general and special damages according
to proof at trial, including but not limited to, physical and/or mental anxiety and
anguish, among other things.

194.     As a direct and proximate result of Defendants' continuing violations of
Plaintiffs' rights, Plaintiffs have suffered in the past, and will continue to suffer in
the future, direct and consequential damages, including but not limited to, the loss
of the ability to exercise its constitutional rights.

195.     The wrongful and despicable conduct of Social Worker Defendants and
Medical Worker Defendants and DOES 1 through 1000, as herein alleged was
intentional, done with malice, oppression, or fraud, with a callous or reckless
indifference to the rights of Plaintiffs, or motivated by an evil intent, such that
Plaintiffs are entitled to recover punitive damages in accordance with law and
subject to proof at trial.

## COUNT 5

**(Violation of Right to Cross Examine witnesses guaranteed by Sixth Amendment to the United States constitution; By All Plaintiffs Against Social Worker Defendants; Medical Worker Defendants; and DOES 1 through 100, Inclusive)**

196.   Plaintiffs re-allege, and to the extent applicable, incorporates herein as if set in full, each of the foregoing paragraphs.

197.   **Sixth amendment of US Constitution** grants the right to confront and cross examine adverse witnesses and right to compel witnesses to testify.

198.   These rights are available to every United States citizen under the Sixth Amendment of US Constitution.

199.   Several actions by the Social Worker Defendants and Medical Worker Defendants acting under the color of law violated the due process rights of plaintiffs, including: (1) the use of the credible-evidence standard of proof to support the indicated finding and the denial of first-stage appeal; (2) the failure to provide timely disclosure of the investigative file and the failure to turn over the complete file; and (3) the violation of statutory and regulatory deadlines concerning the investigation, the indicated finding, the hearing, and the issuance of the Director's decision.

200.     Plaintiffs were denied the right to right to confront and cross examine

adverse witnesses and right to compel witnesses to testify have been violated.

Various State Actors including Administrative Law Judge Marko Djurisic under

the color of State law refused to enforce the subpoena for 39 properly subpoenaed

defendants who failed to appear. These people were also emailed the scanned

subpoena letter by the plaintiffs as courtesy. The plaintiffs did not get the chance

to question and cross examine the defendants.

201.     The State Actor Defendant Administrative Law Judge Marko Djurisic

refused to admit Request of Admissions even though the defendants failed to

answer them even after more 30 days.

202.     The State Actor Defendant DCSF Administrative Law Judge Marko

Djurisic refused to sanction these people who violated the subpoena. DCFS Judge

Marko Djurisic explained that he does not have power to enforce the penalties

mentioned in subpoena. DCFS Administrative Law Judge explained that the

verbiage mentioned in the subpoenas "Your failure to appear in response to this

subpoena is punishable by a term of imprisonment of not more than 6 months, a

$500 fine, or both and/or by an attachment for contempt" is just meant to scare

people but he cannot really enforce it.

203.     These actions of Defendant Marko Djurisic violated rights granted by Sixth

amendment of US Constitution.

COMPLAINT FOR DAMAGES – PAGE 68 OF 91

204. The state and private actors under color of state law have used the coercive power of State to force Plaintiffs in depriving and violating the freedom of choice of the medical treatment.

205. The forcible acts of state actor and private actor defendants have violated Plaintiffs' right to Cross-Examine witnesses.

206. Defendants' violation of Plaintiffs' rights to Cross-Examine witnesses has caused and will continue to cause Plaintiffs to suffer undue and actual hardship and irreparable injury.

207. Plaintiffs have no adequate remedy at law to correct the continuing deprivations of its most cherished constitutional liberties.

208. As a direct and proximate result of Defendants' continuing violations of Plaintiffs' rights, Plaintiffs have suffered in the past, and will continue to suffer in the future, direct and consequential damages, including but not limited to, the loss of the ability to exercise its constitutional rights.

209. As the direct and proximate result of the Social Worker Defendants and Medical Worker Defendants actions and DOES 1 through 100, Plaintiffs have suffered, and will continue to suffer, physical, mental, and emotional and financial injury, all to an extent and in an amount subject to proof at trial. Plaintiffs have also incurred, and will continue to incur, attorney fees, costs and expenses, to an extent and in an amount subject to proof at trial.

## COUNT 6

**(Violation of Due process and Equal Protection guaranteed by Fourteenth Amendment to the United States constitution; By All Plaintiffs Against Social Worker Defendants; Medical Worker Defendants; and DOES 1 through 100, Inclusive)**

210. Plaintiffs re-allege, and incorporate by reference all preceding allegations.

211. Social Worker Defendants and Medical Worker Defendants and DOES 1 through 100 have conspired to threaten Plaintiffs liberty right to custody of their children available under the privileges and immunities clause of the Fourteenth Amendment of the U.S. Constitution

212. Social Worker Defendants and Medical Worker Defendants and DOES 1 through 100 have conspired to deny due process under the Fourteenth Amendment; where Plaintiff has been denied equal protection under the Fourteenth Amendment.

213. Plaintiffs have no adequate remedy at law to correct the continuing deprivations of its most cherished constitutional liberties.

214. As a direct and proximate result of Defendants' continuing violations of Plaintiffs' rights, Plaintiffs have suffered in the past, and will continue to suffer in

the future, direct and consequential damages, including but not limited to, the loss

of the ability to exercise its constitutional rights.

215.     As the direct and proximate result of the Social Worker Defendants and

Medical Worker Defendants actions and DOES 1 through 100, Plaintiffs have

suffered, and will continue to suffer, physical, mental, and emotional and financial

injury, all to an extent and in an amount subject to proof at trial. Plaintiffs have

also incurred, and will continue to incur, attorney fees, costs and expenses, to an

extent and in an amount subject to proof at trial.

## SECOND CLAIM FOR RELIEF

## FOR MONELL-RELATED CLAIMS

## COUNT 1

**(By All Plaintiffs Against George Sheldon (in his official capacity only); and DOES**

**1 through 100, Inclusive)**

216.     Plaintiffs re-allege, and to the extent applicable, incorporates herein as if set

in full, each of the foregoing paragraphs.

217.     Defendant is a "person" within the meaning of 42 U.S.C. § 1983 and

subject to Monell liability. Monell v. Dept. of Social Services (1978) 436 U.S.

658. Defendants, and each of them, acted under color of state law when committing the acts alleged herein, in violation of Plaintiffs' rights.

218.    Plaintiffs are informed and believe and thereon allege that as the Director of IL DCFS, George Sheldon, was at all times relevant herein, possessed of final policy making authority in that the Governor delegated such power and responsibility to them, including but not limited to the responsibility to set policies and priorities for IL DCFS and the supervision and management of staff performing all child welfare services.

219.    Based on the duties charged to IL DCFS, including the nature of its work relating to DCFS Court proceedings, George Sheldon knew or should have known of the obvious need to establish customs, policies, and practices required to protect the aforementioned civil rights of parents and their children.

220.    Defendant George Sheldon established and/or followed policies, procedures, customs, and/or practices which policies were the moving force behind the violations of Plaintiffs' constitutional rights, including those under the Fourth and Fourteenth Amendments, by, but not limited to:

(A)    the policy of examining children without exigency, need, or proper court order, and without the presence and/or consent of their parent or guardian;

(B) the policy of using trickery, duress, fabrication and/or false testimony and/or evidence, and in failing to disclose exculpatory evidence, in preparing and presenting reports and court documents to the Court, causing an interference with parental rights, including those as to familial relations;

(C) by acting with deliberate indifference in implementing a policy of inadequate training and/or supervision, and/or by failing to train and/or supervise its officers, agents, employees and state actors, in providing the constitutional protections guaranteed to individuals, including those under the Fourth and Fourteenth Amendments, when performing actions related to child abuse and dependency type proceedings;

(D) the policy, practice, or custom of making knowingly false allegations of child abuse, neglect, or abandonment in DCFS Petitions signed under penalty of perjury as a means of intimidating parents, by coercion, into accepting lesser charges, whether true or not and whether justified by extant evidence or not, thereby enabling the county to keep the family in the DCFS system and record the case as a positive outcome for purposes of statistical analysis related to funding by the State and Federal governments; and

(E) the custom, policy, and/or practice of fraudulently charging parents

with child abuse where none exists.

(This list is not exhaustive due to the pending nature of discovery and the

privileged and protected records of investigative and juvenile dependency type

proceedings. Plaintiffs may seek leave to amend this pleading as more information

becomes available.)

221.    Director George Sheldon should have known, that by breaching the above-

mentioned duties and obligations that it was reasonably foreseeable that its agency

policies, practices, customs, and usages would, and did, cause Plaintiffs to be

injured and damaged by wrongful policies, or deliberate lack thereof or deliberate

indifference to the need for such policies and/or training, and other acts as alleged

herein, and that such breaches occurred in contravention of public policy and their

legal duties and obligations to Plaintiffs; and that such policies were the moving

force behind the violation of Plaintiffs' constitutional rights as alleged herein

above. Namely, Plaintiffs' civil rights were violated, as mentioned above, when

Social Worker Defendants and DOES 1 through 100, while acting under color of

state law and in conformance with official policies, conspired and/or acted to seize

Plaintiffs' child without a warrant; and then lied about Plaintiffs in various court

reports submitted to the Court.

222.    Defendants sued in their official capacity who had supervisory and/or

policy making authority, had a duty to Plaintiffs, at all times to establish,

implement and follow policies, procedures, customs and/or practices (hereinafter

referred to as "policy" or "policies") which confirm and provide the protections

guaranteed Plaintiffs under the United States Constitution, including those under

the First, Fourth, and Fourteenth Amendments, to include without limitation, the

protection of the right to familial relations; the right to privacy; the right not to be

defamed or stigmatized; the right to be free of the use of excessive police force;

and the right to procedural due process. Said defendants also had a duty to use

reasonable care to select, assign, supervise, train, control and review the activities

of all their agents, officers, employees and those acting under them so as to protect

these constitutional rights; and to refrain from acting with deliberate indifference

to the constitutional rights of Plaintiffs in order to avoid causing the injuries and

damages alleged herein

223.    Based on the duties charged to George Sheldon, including the nature of its

work relating to DCFS court proceedings, the defendant knew or should have

known of the obvious need to establish customs, policies, and practices required to

protect the aforementioned civil rights of parents and their children.

224.    These actions, and/or inactions, of George Sheldon are the moving force

behind, and direct and proximate cause of Plaintiffs' injuries, as alleged herein;

and as a result, Plaintiffs have sustained general and special damages, to an extent

and in an amount to be proven at trial. In addition, Plaintiffs have incurred, and

will continue to incur, attorney fees, costs and expenses, including those as

authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at

trial.

## THIRD CLAIM FOR RELIEF

### FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**(By All Plaintiffs Against Social Worker Defendants; Medical Worker Defendants; and DOES 1 through 100, Inclusive)**

225.    Plaintiffs re-allege, and to the extent applicable, incorporates herein as if set

in full, each of the foregoing paragraphs.

226.    Each of the above mentioned Social Worker Defendants, Medical Worker

Defendants, and DOES 1 through 100, participated in, conspired with, approved

of, and/or aided and abetted the conduct of the remaining culpable parties

mentioned herein.

227.    Plaintiffs are informed and believe that Social Worker Defendants, Medical

Worker Defendants, DOES 1 through 100, and each of them, intended to cause

harm to Plaintiffs, or acted with reckless disregard for the possibility that Plaintiffs

would suffer extreme emotional distress as a result of their outrageous conduct listed above.

228.    As the direct and proximate result of the Social Worker Defendants, Medical Worker Defendants, and DOES 1 through 100, extreme and outrageous conduct, Plaintiffs have suffered extreme emotional and physical distress, including but not limited to fright, nervousness, sleeplessness, anxiety, worry, mortification, shock, humiliation, and indignity, to an extent and in an amount subject to proof at trial. Nobody, including Plaintiffs, could reasonably be expected to endure the types of affront inflicted upon Plaintiffs without sustaining the type of damages herein alleged.

229.    Plaintiffs are informed and believe and thereon allege that Social Worker Defendants, Medical Worker Defendants, and DOES 1 through 100 acted knowingly and wilfully, with malice and oppression, and with the intent to harm Plaintiffs. Therefore, Plaintiffs are entitled to an award of punitive damages for the purpose of punishing said governmental agents, and to deter them and others from such conduct in the future.

## FOURTH CLAIM FOR RELIEF

## FOR NEGLIGIENT INFLICTION OF EMOTIONAL DISTRESS

## (By All Plaintiffs Against Social Worker Defendants; Medical Worker Defendants; and DOES 1 through 100, Inclusive)

230.    Plaintiffs re-allege, and to the extent applicable, incorporates herein as if set

in full, each of the foregoing paragraphs.

231.    Each of the above mentioned Social Worker Defendants, Medical Worker

Defendants, and DOES 1 through 100, participated in, conspired and presented

perjured testimony and fabricated evidence to support the false and malicious

allegations that minor Plaintiff A.T. was being abused and neglected by his parents

and failing to disclose exculpatory evidence; questioning and obtaining testimony

from Plaintiffs through the use of undue influence, coercion, and duress; and

continuing to harass, annoy, and lie to Plaintiffs, and otherwise interfere with

Plaintiffs' lives.

232.    As the direct and proximate result of the Social Worker Defendants and

Medical Worker Defendants, and DOES 1 through 100 negligent conduct,

Plaintiffs have suffered extreme emotional and physical distress, including but not

limited to fright, nervousness, sleeplessness, anxiety, worry, mortification, shock,

humiliation, and indignity, to an extent and in an amount subject to proof at trial.

Nobody, including Plaintiffs, could reasonably be expected to endure the types of affront inflicted upon Plaintiffs without sustaining the type of damages herein alleged.

233.     Plaintiffs are informed and believe and thereon allege that Social Worker Defendants and Medical Worker Defendants, and DOES 1 through 100 acted knowingly and wilfully, with malice and oppression, and with the intent to harm Plaintiffs. Therefore, Plaintiffs are entitled to an award of punitive damages for the purpose of punishing said governmental agents, and to deter them and others from such conduct in the future.

234.     Plaintiffs re-allege, and to the extent applicable, incorporates herein as if set in full, each of the foregoing paragraphs.

## FIFTH CLAIM FOR RELIEF

## FOR INVASION OF PRIVACY

**(By All Plaintiffs Against Social Worker Defendants; Medical Worker Defendants; and DOES 1 through 100, Inclusive)**

235.     Plaintiffs re-allege, and to the extent applicable, incorporates herein as if set in full, each of the foregoing paragraphs.

236.    Plaintiffs have a protected liberty interest in the privacy and integrity of

their family unit, free of unwarranted governmental intrusion

237.    Social Worker Defendants and Medical Worker Defendants intruded upon

the privacy of Plaintiffs' family by, but not limited to, threatening to remove A.T.

from the parents without judicial authorization, without parental consent, and in

the absence of exigent circumstances; failing to discharge their duty to consider

and illegally seizing A.T. for prolonged interrogation without authorization of

parents. Each and every act mentioned above was carried out intentionally, and

with full knowledge of the probable consequences thereof.

238.    Said intrusions upon the family home and privacy interests of Plaintiffs

would be highly offensive to any reasonable person, and was, in fact, highly

offensive to Plaintiffs.

239.    As the direct and proximate result of the Social Worker Defendants and

Medical Worker Defendants actions, Plaintiffs have suffered, and will continue to

suffer, physical, mental, and emotional and financial injury, all to an extent and in

an amount subject to proof at trial. Plaintiffs have also incurred, and will continue

to incur, attorney fees, costs and expenses, to an extent and in an amount subject to

proof at trial.

## SIXTH CLAIM FOR RELIEF

## FOR DECLARATORY RELIEF

**(By All Plaintiffs Against Social Worker Defendants; Medical Worker Defendants; and DOES 1 through 100, Inclusive)**

240.   Plaintiffs re-allege, and to the extent applicable, incorporates herein as if set

in full, each of the foregoing paragraphs.

241.   As stated herein, Plaintiffs, as citizen and individuals, are protected by the

laws of the United States Constitution, including the Fourth and Fourteenth

Amendments thereto.

242.   As stated herein, Defendants and DOES 1 through 100, inclusive, have

wrongfully, unlawfully, and with deliberate indifference to the rights of Plaintiffs,

and with utter disregard of duties and obligations to Plaintiffs, acted, practiced

and/or adopted policies, practices, procedures and/or customs which are in

violation of the rights of Plaintiffs, including those to be free from governmental

interference as to their familial associations and from unreasonable searches or

seizures, including those relating to child abuse allegations and related actions and

proceedings.

243.   Defendants have failed to acknowledge their improper, unlawful and

unconstitutional actions, conduct and policies at the time of the incidents at issue

in the present action, and Plaintiffs are informed and believe, and on that basis

allege, that presently Defendants has not changed or modified such actions,

conduct and/or policies to conform to law.

244.    Defendants wrongful and unlawful conduct, actions and/or policies, unless

and until enjoined and restrained by order of this court, will cause, and continue to

cause, great and irreparable injury to Plaintiffs, and other individuals and citizens,

in that Defendants will continue to act in accordance with said unlawful policies,

and with deliberate indifference to their duties and obligations under state and

federal law, including those under the Fourth and Fourteenth amendments as

alleged hereinabove.

245.    In addition, so long as A.T., remains a minor, and in the custody and care of

Plaintiffs, all of the acts mentioned herein are repeatable.

246.    Plaintiffs have no adequate remedy at law to prevent or prohibit Defendants

from continuing, and/or repeating, its unlawful and unconstitutional conduct and

policies other than through injunctive relief, and therefore seeks an order enjoining

and prohibiting Defendants by, but not limited to, the following:

    (A)    the policy of detaining and/or removing children from their family

        18 and homes without exigent circumstances (imminent danger of

        serious bodily injury), court order and/or consent;

(B) the policy of removing children from their family and their homes without first obtaining a warrant when no exigency exists;

(C) the policy of examining children without exigency, need, or proper court order, and without the presence and/or consent of their parent or guardian;

(D)    the policy of removing and detaining children, and continuing to detain them for an unreasonable period after any alleged basis for detention is negated;

(E) the policy of using trickery, duress, fabrication and/or false testimony and/or evidence, and in failing to disclose exculpatory evidence, in preparing and presenting reports and court documents to the Court, causing an interference with parental rights, including those as to 5 familial relations;

(F) by acting with deliberate indifference in implementing a policy of inadequate training and/or supervision, and/or by failing to train and/or supervise its officers, agents, employees and state actors, in providing the constitutional protections guaranteed to individuals, including those under the Fourth and Fourteenth Amendments, when performing actions related to child abuse and dependency type proceedings;

(G)    the practice of setting forth allegations in DCFS Court against

parents claiming violations of child abuse regardless of whether or not

specific, articulable evidence exists at the time to support the claims set

out in the petition under penalty of perjury;

(H)    the policy, practice, or custom of making knowingly false allegations

of child abuse, neglect, or abandonment in Juvenile Dependency

Petitions signed under penalty of perjury as a means of intimidating

parents, by coercion, into accepting lesser charges, whether true or not

and whether justified by extant evidence or not, thereby enabling the

county to keep the family in the juvenile dependency system and record

the case as a positive outcome for purposes of statistical analysis related

to funding by the State and Federal governments; and

(I) the custom, policy, and/or practice of fraudulently charging parents with

child abuse where none exists.

(J) the custom, policy and practice of fraudulently violating the entirety of

property and liberty interests, associational rights, and fundamental

parent child relationships that are protected by the United States

Constitution and the Bill of Rights.

(K)    the custom, policy and practice of intentionally and illegally violating

constitutional rights of parents;

(L) the practice of conspiring and violating the laws and Constitution of the United States under color of state law and illegally invoking the coercive authority of the State.

(M) Order the Social Worker Defendants and Medical Worker Defendants to learn, respect and obey constitutional rights guaranteed by various Amendments of United States Constitution;

(N) the practice of accusing parents and finding them guilty of child abuse and neglect if the parents decide to use the medically established and proven Ketogenic diet for treating Seizures and Epilepsy, Brain Tumors/Cancer, Autism, Alzheimer, Mitochondrial Disorder and numerous other neurological conditions.

(O) Order Defendant George Sheldon and Deanna Large to remove names of Defendants from the SCR Registry maintained by them.

(P) Grant the Plaintiffs such other and further relief as this Court deems just and proper.

(This list is not exhaustive due to the pending nature of discovery and the privileged and protected records of investigative and juvenile dependency type proceedings. Plaintiffs may seek leave to amend this pleading as more information becomes available.)

## SEVENTH CLAIM FOR RELIEF

## FOR PRELIMINARY INJUNCTIVE RELIEF

### (By All Plaintiffs Against Social Worker Defendants; Medical Worker Defendants; and DOES 1 through 100, Inclusive)

247.    Plaintiffs re-allege, and to the extent applicable, incorporates herein as if set in full, each of the foregoing paragraphs.

248.    Plaintiffs reiterate that their request to this Court is not just about a supported and reasonable expectation of some future manifest deprivations of their various civil, constitutional, and equal rights within the same system of State and Private Actors acting under Color of State law, but also that such a deliberately unlawful pattern of the same is well established, threatened yet again, and must be stopped.

249.    The U.S. Supreme Court recently revisited the requirements for preliminary injunction in Winter v. NRDC, Inc., 129 S.Ct. 365 (2008); 555 U.S. 7 (2008).

1.  A substantial likelihood of success on the merits of the case exists where Defendants have denied Plaintiff of fundamental rights secured by the U.S. Constitution.

Case: 1:16-cv-11236 Document #: 1 Filed: 12/09/16 Page 87 of 91 PageID #:87

2. Plaintiff faces the substantial likelihood of irreparable harm in the absence of a preliminary injunction. Plaintiff has already suffered irreparable harm absent issuance of a preliminary injunction. Plaintiffs parental and associative rights to the care, custody, and control of Plaintiffs minor children and the children's reciprocal autonomous associative rights to a relationship with Plaintiff have been implicated and destroyed.

3. The balance of harm is unequivocally in favor of Plaintiffs.

4. Defendants have threatened to take the child away numerous times in past. The threat is immediate.

5. There is no other available remedy.

6. Plaintiffs injury is not outweighed by the public good. State Actors and Private Actors trying to show the public interest does not outweigh the injury to Plaintiff and Plaintiffs minor children.

250.    Where the requirements must be weighed, considered, and balanced as opposed to elements that must be met, the course of Defendants' conduct requires issuance of a preliminary injunction until the case is decided. Cf. Cienna Corp. V. Jarred, 203 F.3d 312, 322 (4th Cir. 2000).

251.    The Defendants together, under color of law, have invoked the coercive

powers of the State to deprive Plaintiff of his fundamental liberty rights, parental

rights, property rights, associational rights, autonomy rights and due process

rights. Defendants have conspired and proceeded to accuse and indicate Plaintiffs

for medical neglect of their children without finding unfitness by a standard of

"clear and convincing" evidence.

252.    Pursuant to the upholding of medical neglect accusation, Defendants, under

color of law, have invoked the official authority of the State to coerce the

Plaintiffs in harming their children. Defendants have also invoked the coercive

authority of the DCFS Administrative Judge to deprive Plaintiffs of his

constitutional rights under color of state law.

253.    Social Worker Defendants and Medical Worker Defendants have conspired

and acted together, through the assistance of various unnamed State Actors and

Private Actors, have engaged in a single plan to the deprivation of Plaintiffs

constitutional rights. Medical Worker Defendants have conspired and have acted

as private party actors under color of state law and have knowingly cooperated and

maliciously attempted to invoke the State Actor Defendants to make a coercive

finding in contempt for alleged findings of medical neglect and deprive Plaintiffs

of employment. Ann & Robert Lurie Children Hospital and various Medical

Worker Defendants, through the assistance of Social Worker Defendants, have

cooperated with the intent to injure and defraud Plaintiffs by invoking the official State authority of the Court to order findings of medical neglect, under the threat of taking children, to induce Plaintiffs into submission.

254.    Plaintiffs request injunctive relief to prohibit further actions by the Defendants that deprive Plaintiffs of their fundamental rights granted by United States Constitution.

255.    Order Defendant George Sheldon to remove Defendants from the registry maintained by him. Alternatively, Defendant George Sheldon be cited to appear herein and demonstrate good cause why his final administrative decision of medical neglect should not be overturned by this court. The plaintiffs reiterate that Defendant Illinois DCFS Director George Sheldon issued his final administrative decision on 110th day (for Plaintiff Sanjay Tyagi) and on 91st day (for Plaintiff Alka Jagatia). DCFS Director George Sheldon was obligated to provide the final decision in the appeal within 90 days. (Lyon vs DCFS et al 2004, Supreme Court of Illinois).

## JURY DEMAND

Plaintiffs Sanjay Tyagi, Alka Jagatia and A.T., demand a jury trial as to all issues so triable.

## **PRAYER**

WHEREFORE, Plaintiffs, Sanjay Tyagi and Alka Jagatia and minor A.T., prays

for judgment against Defendants, as to all causes of action, as follows:

1. General damages and special damages according to proof, but in no event less

   than $1,000,000;

2. As against only the individual defendants and not any municipality, punitive

   damages as allowed by law;

3. Attorneys fees pursuant to 42 U.S.C. § 1988, and any other appropriate statute;

4. Injunctive relief, both preliminary and permanent, as allowed by law,

   (including preliminary injunctive relief to be based upon a separate

   application);

5. Costs of suit incurred herein; and

6. Such further relief as the Court deems just and proper.

Dated this _9th_ day of _DECEMBER_____, _2016_.

Respectfully submitted,

_ALKA JAGATIA_
Petitioner Name

_SANJAY TYAGI_
Petitioner Name

s/ Sanjay Tyagi

COMPLAINT FOR DAMAGES – PAGE 90 OF 91

Petitioners, Pro Se

P.O. Box 597124
Chicago, IL 60659
Phone: (312) 278-3425
Email – sanjaytyagi6@gmail.com

# **VERIFICATION**

We hereby declare, verify, certify and state, pursuant to the penalties of perjury under the laws of the United States, and by the provisions of 28 U.S.C. § 1746, that the above and foregoing representations are true and correct to the best of our knowledge, information, and belief.

Dated this 9th day of DECEMBER , 2016 .

ALKA JASATIA
Petitioner Name

SANJAY TYAGI
Petitioner Name

Sanjay Tyagi, Petitioner
P.O. Box 597124
Chicago, IL 60659
Phone: (312) 278-3425
Email – sanjaytyagi6@gmail.com

COMPLAINT FOR DAMAGES – PAGE 91 OF 91