## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| SANJAY TYAGI, ALKA JAGATIA, and<br>A.T., a minor,<br><br>Plaintiffs,<br><br>v.<br><br>GEORGE SHELDON, MARCO I. DJURSIC<br>DONALD JONKER, LAWRENCE ALBERG,<br>DEANNA LARGE, NORA HARMS PAVELSKI,<br>STEVIE LEMON, ERAINA ROSS BURLESON,<br>MARISOL RUBINO, SYLVIA TORRES<br>STEPHENS, ANN & ROBERT H. LURIE<br>CHILDREN'S HOSPITAL OF CHICAGO, ANN &<br>ROBERT H. LURIE CHILDREN'S HOSPITAL<br>OF CHICAGO FOUNDATION, PEDIATRICS<br>FACULTY FOUNDATION INC., CHILDREN'S<br>HOSPITAL OF CHICAGO MEDICAL CENTER,<br>LURIE CHILDREN'S MEDICAL GROUP LLC,<br>LEON EPSTEIN, ALMA BICKNESE, MELISSA<br>CIRRILLO, LAUREN MARSILLIO, RANA<br>MAFEE, AND JOHN DOES 1-100,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 16 C 11236<br><br>Judge Thomas M. Durkin |

## MEMORANDUM OPINION & ORDER

*Pro se* plaintiffs Sanjay Tyagi and Alka Jagatia ("the plaintiffs") are married.
Their minor son and co-plaintiff, A.T., has had a number of seizures over the last
several years. The plaintiffs disagreed with A.T.'s doctors—defendants Leon
Epstein, Alma Bicknese, Melissa Cirrillo, Lauren Marsillio, and Rana Mafee ("the
doctor defendants")—on the appropriate course of treatment for A.T.'s seizures after

his admission to Defendant Lurie Children's Hospital[1] (Lurie's) for status epilepticus. That disagreement ultimately led an unnamed employee at Lurie's to initiate a referral to the Illinois Department of Child and Family Services ("DCFS"). Three DCFS social workers—Defendants Eraina Ross Burleson, Marisol Rubino, and Sylvia Torres Stephens ("the social worker defendants")—were assigned to investigate allegations of medical neglect.[2]

At the conclusion of their investigation, the social worker defendants determined that the allegations of medical neglect were supported by "credible evidence," and a report was filed against the plaintiffs in the State Central Register ("SCR"), of which Defendant Deanna Large is alleged to be the administrator. A.T. was never removed from the plaintiffs' custody, but at some point he began following the doctor defendants' recommended course of treatment, presumably over the plaintiffs' objections.

---

[1]    Drs. Epstein, Bicknese, Cirrillo, and Marsillo are alleged to work at Lurie's, and Dr. Mafee is alleged to work at non-defendant APAC Center of Pain Management. The complaint names a number of entities in addition to the hospital itself as "directly or indirectly employ[ing] the above doctors." Those entities are Defendants Ann & Robert H. Lurie Children's Hospital of Chicago Foundation, Pediatrics Faculty Foundation Inc., Children's Hospital of Chicago Medical Center, and Lurie Children's Medical Group LLC. They are referred to collectively as "the corporate defendants."

[2]    The complaint also names Nora Harms Pavelski, the Deputy Bureau Chief of DCFS, and Stevie Lemon, a supervisor in the Department of Child Protection. Other than identifying them by their job titles, the complaint is silent as to their role in this case. The Court infers from their titles that they are alleged to have played a supervisory role in the social worker defendants' investigation.

The plaintiffs appealed the credible evidence finding and sought expungement of their record in the SCR through DCFS's administrative review process. DCFS was represented by Defendants Donald Jonker and Lawrence Alberg ("the attorney defendants") during that appeal. Following an evidentiary hearing, Defendant Marco Djurisic, the presiding Administrative Law Judge, sustained the report of medical neglect, finding that it was supported by a preponderance of the evidence. He recommended to the then-Director of DCFS, Defendant George Sheldon, that the report of medical neglect should remain on file in accordance with DCFS rules, and that the plaintiffs' request for expungement should be denied. Former-Director Sheldon summarily adopted Judge Djurisic's ruling and followed his administrative recommendations. In a letter to the plaintiffs notifying them of Former-Director Sheldon's decision, they were advised of their right to seek judicial review in the state circuit court.

On December 9, 2016, the plaintiffs filed a 91-page complaint in federal court against the defendants identified above and 100 John Does. The complaint asserts seven claims for relief, several with multiple subparts.[3] According to the complaint, "[t]his action arises under the First, Fourth, Sixth and Fourteenth Amendments to

---

[3]     The plaintiffs appear to have attempted to file the complaint as a class action lawsuit on behalf of themselves and "all others similarly situated." R. 1 (Compl.) at 1. But their civil cover sheet does not check the required box for class actions, R. 2, and the complaint does not allege any of the prerequisites to filing on behalf of a class set forth in Federal Rule of Civil Procedure 23(a). In the absence of any plausible allegations that a certifiable class exists, and because the plaintiffs need counsel in order to pursue a class suit, *see Howard v. Pollard*, 814 F.3d 476, 478 (7th Cir. 2015), the Court will treat the lawsuit as an action by and on behalf of the individual plaintiffs only.

the United States Constitution and under federal law, particularly 42 U.S.C. § 1983," and so falls within the subject matter jurisdiction of this Court pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.[4] R. 1 ¶ 6. The complaint also invokes the Court's supplemental jurisdiction over several state law claims pursuant to 28 U.S.C. § 1367.[5]

Former-Director Sheldon, Judge Djurisic, the attorney defendants, the social worker defendants and their supervisors (collectively, "the DCFS defendants"), and Dr. Mafee, Dr. Epstein, Dr. Bicknese, Dr. Cirrillo, Dr. Marsillio, Lurie's, and the corporate defendants (collectively "Dr. Mafee and the Lurie defendants") separately move to dismiss the complaint in its entirety. Although their reasoning differs, both groups of defendants argue that: (1) the claims advanced against them have not been pled with the particularity required by the Federal Rules of Civil Procedure; (2) they are immune from suit; and (3) the plaintiffs have failed to allege facts

---

[4] The complaint also purports to state claims under criminal statutes 18 U.S.C. §§ 241 and 242. *See, e.g.,* R. 1 (Compl.) ¶¶ 1, 7. "[I]t is well settled no private right of action inheres in those criminal provisions." *Pawelek v. Paramount Studios Corp.*, 571 F. Supp. 1082, 1083 (N.D. Ill. 1983) (citing *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980) (per curiam)). In addition, the complaint incorrectly alleges subject-matter jurisdiction pursuant to 28 U.S.C. § 1332. *See, e.g.,* R. 1 ¶¶ 2, 7, 12-15. The parties are not diverse; they are all residents of the state of Illinois. Finally, the plaintiffs' citations to 28 U.S.C. §§ 1441, 1443 and 1446, *see* R. 1 ¶¶ 2, 7, 12-15, are also incorrect because, among a number of other reasons, this case has not been removed from state court.

[5] The *Rooker-Feldman* doctrine, which deprives the federal district courts of appellate jurisdiction over state court judgments, does not apply to bar collateral review of administrative decisions. *See Van Harken v. City of Chicago*, 103 F.3d 1346, 1348 (7th Cir. 1997).

sufficient state a plausible claim against them. R. 117 (the DCFS defendants); R. 115 (Dr. Mafee and the Lurie defendants).

## Preliminary Admonitions

Several procedural issues must be addressed before the Court can reach the merits of the pending motions. All parties, including parties proceeding *pro se*, are required to comply with the Federal Rules of Civil Procedure, the local rules of this district, and the rules of this Court. All of these rules are available on the public website for the United States District Court for the Northern District of Illinois. The parties are instructed to consult these rules, including the rules setting forth formatting and searchability requirements for electronic filings, page limits, citations to unpublished opinions, and rules regarding providing courtesy copies to chambers. The parties are also instructed to review and comply with rules pertaining to motion practice, including pre-filing meet-and-confer requirements and post-filing notice procedures. *Pro se* parties may wish to contact the District Court's Self-Help Assistance Program to ensure compliance with all applicable rules. *See* R. 147 (setting forth instructions on how to make an appointment).

With respect to page limits, if a party requires pages beyond the number permitted by the local rules, that party must seek leave from this Court to file an oversized brief by filing a motion. Shrinking margins, changing spacing, or adjusting font size does not make a brief compliant if the margins, spacing, and font size do not comport with local formatting rules. When requesting leave to file an oversized brief, a party must inform the Court why it is unable to argue its position

in the number of pages the rules allow. Only in exceptional circumstances will oversized briefs be warranted and therefore allowed.

Importantly, all authority relevant to a motion must be cited in that motion within permitted page limits. If a party wishes to file additional authority in support of a pending motion after its brief has been filed, the party must seek leave to do so, explaining in its motion for leave why the authority was not cited in the first instance. The Court is capable of conducting its own legal research. To that end, decades-old judicial opinions may not be the subject of a motion to file additional authority. The Court will consider permitting parties to submit judicial opinions issued *after* the filing of their briefs, but only if they control or are directly relevant to the resolution of a contested issue. If leave to file such authority is granted, it should be filed without annotation or explanation.

Further, no party may file any documents in support of a motion that has been denied or in contravention of a ruling of this Court. For example, if the Court has stayed discovery, a party may not file a motion to compel the production of records or to appoint an expert witness (which the Court usually cannot do in any event). In the same vein, if the Court has ruled that it is premature to rule on evidentiary matters, a party should not seek such a ruling until the procedural posture of the case has changed or unless the party has sought and been granted leave of court to file such a request. Finally, the Court does not accept any documents filed simply for its education, particularly if they have little to nothing to do with the allegations in the case. And all meet-and-confer, electronic filing, and

notice requirements apply to motions for leave to deviate from any applicable rules or court orders.

The Lurie defendants have moved to strike all non-compliant filings from the docket. R. 182. Although their concerns are well-taken, in light of the greater leniency permitted to *pro se* plaintiffs, the Court denies the motion. But the parties are hereby on notice that failure to comply with the rules will, from this point forward, result in the immediate striking of any non-compliant filings from the docket. Continual and willful non-compliance may result in harsher sanctions.

## Standard

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *E.g., Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged.'" *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Mann*, 707 F.3d at 877.

In evaluating a *pro se* complaint, the Court applies a less stringent standard than it applies to formal pleadings drafted by lawyers. *Smith v. Dart*, 803 F.3d 304, 309 (7th Cir. 2015). But the Court need not ignore facts set forth in the complaint that undermine the plaintiff's claim, nor is the Court required to accept the plaintiff's legal conclusions. *Johnson v. Thompson-Smith*, 203 F. Supp. 3d 895, 900 (N.D. Ill. 2016).

### Factual Background

Reading the 91-page *pro se* complaint broadly, as the Court must, and incorporating any facts consistent with the allegations in the complaint set forth in the plaintiffs' response briefs and additional filings,[6] the Court understands the relevant factual allegations as follows.[7]

---

[6] A motion under Rule 12(b)(6) can be based "on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (citations omitted). The Court therefore considers the complaint, R. 1, and the Opinion and Recommendation of Administrative Law Judge, R. 125, which is extensively referenced in the complaint, *see, e.g.*, R. 1 ¶¶ 120-122, and of which the Court may take judicial notice, *see Park Superintendents' Prof'l Ass'n v. State of Illinois*, 1998 WL 525810, at *2 (N.D. Ill. Aug. 18, 1998) (citing *Doherty v. City of Chicago*, 75 F.3d 318, 324 n. 4 (7th Cir. 1996)).

And, although a plaintiff may not *amend* its complaint by way of a response brief, *see Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996), nothing

A.T. has had at least four seizures in his life. *See* R. 1. ¶¶ 60, 68, 103 (referring to four "provoked seizures"). At least two of those seizures have been classified as "status epilepticus."[8] *See* R. 125 at 5-8. The plaintiffs believe that the doctors at Lurie's either misdiagnosed or insufficiently investigated the cause of A.T.'s seizures. *See, e.g.,* R. 1. ¶¶ 60, 68, 103. They dispute that A.T. has epilepsy; they consider each of his seizures to have been "provoked" by different circumstances including "(1) Strep throat (2) Persistent diarrhea for 15-20 days (3) high fever (4) Overheated and dehydration while playing basketball." *Id.* ¶ 103.

---

prevents a plaintiff opposing a motion to dismiss from *elaborating* on the facts allegations in the complaint, as long as the new elaborations are consistent with those facts. *See Smith*, 803 F.3d at 311 ("[F]acts alleged by a plaintiff in a brief in opposition to a motion to dismiss 'may be considered when evaluating the sufficiency of a complaint so long as they are consistent of the allegations in the complaint.'") (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1367 n. 2 (7th Cir. 1997)); *see also Geinosky*, 675 F.3d at 745 n. 1 (collecting authority); *Early v. Bankers Life & Cas. Co.,* 959 F.2d 75, 79 (7th Cir. 1992) ("[A] plaintiff is free, in defending against a motion to dismiss, to allege without evidentiary support any facts he pleases that are consistent with the complaint, in order to show that there is a state of facts within the scope of the complaint that if proved (a matter for trial) would entitle him to judgment."). This is particularly true when the plaintiffs are *pro se*, and the court must construe their allegations liberally and make reasonable presumptions in their favor. In deciding these motions, the Court therefore considers all relevant facts set forth in the plaintiffs' miscellaneous filings in opposition to dismissal, provided those facts are consistent with the allegations set forth in the operative complaint.

[7] A number of paragraphs in the complaint set forth facts entirely irrelevant to the alleged constitutional claims. *E.g.,* R. 1 ¶ 74 (alleging the location of certain of the Lurie defendants' bank accounts); *id.* ¶ 108 (excerpting a study about the national rate of unreported medical mistakes and "iatrogenic events").

[8] Judge Djurisic found that "status epilepticus" is a "severe, continual seizure that can lead to brain damage, motor impairment, internal organ failure and death. Estimates of mortality during an individual episode of status epilepticus are approximately ten to twenty percent." R. 125 at 6.

## A.    The Dispute Regarding A.T.'s Treatment

At some point, A.T.'s doctors prescribed a medication called Keppra as part of A.T.'s treatment regimen. *Id.* ¶ 63. Keppra is an antiepileptic medication with a host of potentially undesirable side effects. *See, e.g., id.* ¶¶ 79, 99, 100. The plaintiffs allege that the doctors decided on this course of treatment not because it would best control A.T.'s seizures, but because the hospital and certain of its administrators receive financial benefits from the pharmaceutical company that makes Keppra. *See id.* ¶¶ 102, 105.

The plaintiffs determined based on their own research that a ketogenic diet is an alternative medical treatment scientifically proven to treat seizures. *See id.* ¶¶ 64-66. They raised the possibility of treating A.T. with the ketogenic diet with A.T.'s doctors at Lurie's, and while at least one doctor agreed that the diet might be reasonable treatment option, *see id.* ¶ 61, other doctors disagreed, s*ee id.* ¶¶ 62-63. Dr. Epstein was so resistant to the plaintiffs' plan to put A.T. on the ketogenic diet without daily antiepileptic medication that his discussion with the plaintiffs on the topic "escalated into a very contentious situation." R. 148-1 (Resp. to Mot. for Prelim. Inj.) at 3. Nevertheless, the plaintiffs purchased a book about the diet written by a physician and initiated the ketogenic diet on their own, without medical supervision. R. 1 ¶¶ 64-66. They did not administer Keppra. The plaintiffs allege that A.T. was then seizure-free for fourteen months on the ketogenic diet alone, and that he excelled at school during that time. *See id.* ¶¶ 67-68.

On February 25, 2016, A.T. had one of his four documented seizures, leading to his admission to Lurie's Pediatric Intensive Care Unit. *Id.* The plaintiffs allege, and the doctor defendants do not dispute, that even if A.T. had been taking Keppra, he may nevertheless have had the seizure that required his admission to intensive care. *See id.* ¶¶ 96-98.

## B.     The DCFS Referral

According to the plaintiffs, once A.T. was admitted to Lurie's following the February 25, 2016 seizure, Dr. Epstein remembered the disagreement he had with the plaintiffs about the course of treatment for A.T.'s seizures. R. 148-1 at 3. The plaintiffs allege that Dr. Epstein devised a plan, with support from Lurie's, to "get back at the plaintiffs," which included "build[ing] a coalition of medical professionals willing to . . . falsely accuse the plaintiffs of medical neglect" by "falsify[ing] the Lurie Medical History to . . . paint [the] plaintiffs as [persons who] medically neglect[ed] their child." *Id.* The plaintiffs allege this plan was set in motion on or around February 28, 2016, when an unidentified member of this coalition at Lurie's (John Doe 1) reported the plaintiffs to DCFS for acting against medical advice. R. 1 ¶ 68. The plaintiffs do not allege what records were falsified, what false information they contained, or how that information made it appear as though the plaintiffs had been neglectful. They do allege that DCFS was falsely informed that A.T. has asthma, which he does not, and that certain brain scans were never taken, even though they were, R. 148-1 (Resp.) at 3-4. But neither of these facts is alleged to have played a role in the events that followed.

Once A.T. recovered from his seizure and was well enough to leave the hospital, another unidentified Lurie defendant (John Doe 2) refused to authorize A.T.'s discharge for thirty-six hours despite the plaintiffs' "repeated demands" that A.T. be permitted to leave. R. 1 ¶ 68. To keep A.T. in the hospital over the plaintiffs' objections, an unnamed Lurie's social worker (John Doe 3) told the plaintiffs that if they tried to leave with A.T., a police officer waiting in the lobby would be called up to speak with them. R. 148-1 at 3-4.

## C.    The DCFS Investigation

After A.T.'s discharge, DCFS investigated the allegations made by John Doe 1. *See* R. 1 ¶ 77. As part of the investigation, the social worker defendants visited A.T. at the Chicago public school he attends without his parents' knowledge or consent. *Id.* ¶¶ 177-83. This took place "[a]round March 2016 and May 2016." *Id.* ¶ 177. The complaint alleges that "no exigent circumstances" existed at the time these school visits took place. *Id.* ¶ 176. The "interrogation" of A.T. at school is alleged to have been permitted by the school principal; the school social worker is alleged to have accompanied A.T. to the interview and to have failed to inform him that he could call his parents or refuse to cooperate. *Id.* ¶¶ 178-82. During that school visit, A.T. was forced to answer "intrusive" questions about his parents and to submit to a physical examination. *Id.*

The social worker defendants also came to the plaintiffs' home twice, both times asking to be let inside to interview A.T. *Id.* ¶ 185. The plaintiffs refused. *Id.* They allege that the social worker defendants threatened to remove A.T. and his

brother from the plaintiffs' custody if the plaintiffs did not allow them to enter their home. *Id.* Fearful of losing their children, the plaintiffs reluctantly allowed the social worker defendants into their home. *Id.* Once there, the social worker defendants allegedly "strip searched" both children, asking them over parental objection to pull down their underpants and submit to an invasive physical examination. *Id.* ¶ 186.

During the course of the investigation, A.T. had another of his two documented status epilepticus seizures requiring his admission to Lurie's. R. 125 at 8. At that time, he began taking Keppra over his parents' continued objections. *See* R. 1 ¶ 104. It is unclear from plaintiffs' allegations whether he also discontinued the ketogenic diet at that time. It is clear from those allegations, however, that A.T. began experiencing several of the negative side-effects of Keppra that his parents were initially concerned about, including headaches, dizziness, hallucinations, and aggressive behavior. *See id.* ¶ 79 (recounting a July 17th email from Tyagi to the defendants describing these symptoms); *id.* ¶ 104 (noting A.T.'s problematic behavior in school). After these side-effects were brought to the attention of DCFS and A.T.'s treating neurologists, no adjustments were made to A.T's seizure management protocol. *See id.*

At the conclusion of the investigation, on July 4, 2016, the defendant investigators determined that "credible evidence" supported that the plaintiffs medically neglected A.T. *See id.* ¶ 77; R. 25 at 4. The plaintiffs allege that the defendant investigators failed to complete their investigation within the permitted

time limits. R. 1 ¶ 93. They further allege that the investigators "failed to gather and consider evidence of innocence," *id.* ¶ 94, which the Court understands to refer to evidence that the ketogenic diet is widely considered an effective treatment for epilepsy and other neurological conditions. Following the investigators' determination, a report of the indicated findings was filed against the plaintiffs with the SCR. *Id.* ¶ 77. The plaintiffs allege that this report impacted their employment or employability. *See* R. 95 at 4 ("Plaintiffs lost their jobs due to addition of names in Illinois SCR Registry. Employers decline to offer jobs after checking the names in Illinois SCR Registry.").

## D.    The Administrative Appeal

The plaintiffs each appealed the medical neglect determination separately through the statutory administrative review process. R. 1 ¶¶ 82, 91. Tyagi appealed on July 24, 2016, and Jagatia appealed on August 12, 2016. *See id.* Jagatia requested to have her appeal expedited pursuant to DCFS Rule 336.85, which entitles child care workers to administrative review on an expedited timeline. *Id.* ¶ 91. The Chief Administrative Law Judge denied her request, determining that she was not within the class of persons entitled to expedited review. *Id.* ¶ 92. The plaintiffs claim this denial was erroneous, alleging that "Jagatia is a qualified nurse who [was] looking to work in a children's health clinic," and therefore fell within the class of persons permitted to expedited review. *Id.*

Judge Djuristic held a preliminary hearing in Tyagi's case on August 15, 2016. *See* R. 139 (Mot. for Prelim. Inj.) ¶¶ 24-25. He continued the hearing twenty-

eight days to September 12, 2016 so that Tyagi could review the investigative file, which he had not yet received because it had been mailed out just a few days earlier (nineteen days after Tyagi faxed his notice of appeal and one day before the expiration of the deadline for turning over the file set forth in DCFS Rule 336.40(d)). *Id.* ¶ 26. The plaintiffs allege that the investigative file sent to them was "heavily redacted," and that this impacted their ability to defend themselves. R. 159-1 (Resp.) at 4.

Judge Djuristic held a preliminary hearing in Jagatia's case on September 6, 2016; she was represented by her husband at that hearing. R. 139 ¶¶ 30-31. During the hearing, Tyagi renewed his request to expedite Jagatia's appeal pursuant to DCFS Rule 336.85. R. 126 (partial administrative hearing transcripts) at 8. Judge Djurisic informed Tyagi that prior to the scheduling of Jagatia's preliminary hearing, the chief administrative law judge had determined that Jagatia did not qualify for expedited review. *See id.* at 8-9. Judge Djurisic informed Tyagi that he would not disturb the chief judge's determination, but that Jagatia could appeal that determination to the state circuit court. *See id.* at 9-11.

At Tyagi's continued preliminary hearing on September 12, 2016, the plaintiffs agreed to consolidate their appeals. *Id.* at 6. Their cases were set for a joint-evidentiary hearing on September 22, 2016. R. 25 (Mot. to Remove Names from Registry) at 4. In preparation for that hearing, Tyagi and Jagatia requested that DCFS subpoena 38 witnesses to testify. R. 1 ¶ 127. The subpoenaed witnesses were, for the most part, doctors from Lurie's—a majority of them listed on Lurie's

website as neurologists and others having a neurological focus within their practice. *See* R. 139-4 at 2-3. The subpoenaed witnesses also included the head of the hospital's ketogenic diet team and four members of the hospital's in-house legal staff. *See id.* The subpoenas were sent by DCFS as requested. *See id.*

On September 22, 2016, all but three of the subpoenaed witnesses, Dr. Epstein, Dr. Bicknese, and Dr. Mafee, failed to appear at the plaintiffs' evidentiary hearing. *Id.*; *see also* R. 1 ¶ 95. Judge Djurisic did not sanction the non-appearing witnesses. *Id.* He informed the plaintiffs that he was without authority to do so, and their only means of compelling witness attendance would be to seek a writ of mandamus in the circuit court. R. 126 at 2-3. DCFS attorney Alberg offered to continue the hearing so that the plaintiffs could attempt to marshal their witnesses, but the plaintiffs declined. *Id.* at 4. The plaintiffs instead opted to proceed with the hearing. *Id.*

Representing himself and his wife, Tyagi extensively questioned Dr. Epstein, Dr. Bicknese, and Dr. Mafee, all of whom appeared by telephone. R. 1 ¶¶ 96-98. When asked if they made the referral to DCFS, all three doctors testified that they did not. *Id.* Tyagi also presented evidence about the dangers of the Keppra and the efficacy of the ketogenic diet. *See id.* ¶¶ 99-100. Dozens of emails from Tyagi attaching hundreds of reports on these topics were also admitted as evidence.[9] *See* R. 125 at 4-5. Further, DCFS stipulated at the hearing "that the Ketogenic Diet is a

---

[9] One of those e-mails, sent on July 23, 2016, indicates that "80+ published medical papers" have already been sent and hundreds more are forthcoming. R. 139-2 at 4.

medically recognized and valid form of treatment for some cases of Epilepsy to prevent seizure that may lead to episodes of Status Epilepticus." *Id.* at 5. Still, the plaintiffs considered the proceeding to have been a "sham trial," because, among other reasons, so many of the subpoenaed witnesses failed to testify. *See* R. 1 ¶ 95; *see also* R. 139 at 16 ("The witnesses did not appear and it was a mockery of Administrative Proceedings.").

Thirty-five days after the hearing, on October 27, 2016, Judge Djurisic issued an opinion and recommendation finding that DCFS had shown by a preponderance of the evidence that the plaintiffs committed medical neglect. R. 125. His opinion detailed the people who attended the hearing, the witnesses' testimony, the stipulation that was entered, evidence that was admitted, and his findings of facts and conclusions of law. *Id.* The plaintiffs allege that the ruling was "legally erroneous." R. 1 ¶ 131.

Exactly two weeks later, on November 10, 2016, Former-Director Sheldon issued his decision adopting Judge Djurisic's opinion and recommendation. *Id.* ¶ 110. The plaintiffs say Former-Director Sheldon's decision was untimely and "arbitrary and capricious." *Id.* ¶¶ 123-33. Accompanying the notice of the final administrative decision was a letter informing the plaintiffs of their right to seek judicial review in state court. R. 139-12. Rather than seek judicial review in state court, the plaintiffs filed the instant lawsuit. The time to appeal the administrative ruling in circuit court expired on December 15, 2016, six days after this lawsuit was filed.

The plaintiffs seek to enforce their First, Fourth, Sixth, and Fourteenth Amendment rights through 42 U.S.C. § 1983. R. 1 at 53-71 (Claim 1, Counts 1-6). The plaintiffs also assert state law claims for intentional and negligent infliction of emotional distress and invasion of privacy. *Id.* at 76-80 (Claims 3-5).[10] All of the claims purport to be asserted against all defendants, but the actual allegations specify the defendants against whom each claim is directed. Therefore, the Court declines the defendants' request to summarily dismiss all claims for failure to comply with Rule 8. R. 116 at 4-6; R. 119 at 5-8; *see* Fed. R. Civ. P. 8; *Ross Bros. Const. Co. v. Int'l Steel Servs., Inc.*, 283 F.3d 867, 873 (7th Cir. 2002) ("Rule 8 does not demand perfection—just notice.")

In addition to monetary damages, the plaintiffs seek various forms of equitable relief, *see* R. 1. at 81-90 (Claims 6 and 7), including a preliminary injunction ordering their names be removed from the SCR and ordering that Former-Director Sheldon show "good cause why his final administrative decision of medical neglect should not be overturned by this court," *id.* ¶ 255. They also request

---

[10]     In their response to the Lurie defendants' motion to dismiss, the plaintiffs suggest that they also meant to bring a claim for medical malpractice. *See* R. 148-1 at 6 ("[T]hey were responsible for misdiagnosis and not doing proper testing."); *id.* at 10 ("The defendants failed to order the proper tests for the minor A.T. The defendants misdiagnosed the symptoms. The defendants misinterpreted the test results."). To bring a medical malpractice claim in Illinois, a plaintiff is required to file the affidavit of a qualified healthcare professional with his complaint. In it, the affiant must declare that he has determined in a written report, based on a review of the medical record, that "there is a reasonable and meritorious cause for the filing of [a malpractice] action." 735 ILCS 5/2-622. Plaintiffs have not filed any such affidavit. Therefore, to the extent the plaintiffs intended that a malpractice claim be construed as part of their complaint, it is dismissed.

an order essentially dismantling the SCR. R. 139 at 19 (asking the court to "declare the statutory scheme underlying the Illinois State Central Register unconstitutional on its face [and] as applied to the Plaintiffs"). More broadly, they request future equitable relief against DCFS in the form of an order prohibiting DCFS from: (1) "removing children from their family and homes without exigent circumstances, court order and/or consent," R. 1 ¶¶ 246(A)-(B) (internal parenthetical omitted); (2) "examining children without exigency, need, or proper court order, and without the presence and/or consent of their parent or guardian," *id.* ¶ 246(C); (3) "detaining children . . . for an unreasonable period after any alleged basis for detention is negated," *id.* ¶ 246(D); and (4) accusing parents of "medical neglect of their children without finding unfitness by a standard of 'clear and convincing' evidence," *id.* ¶ 251.[11] They also seek an order compelling a level of training and supervision of

_____

[11]    The complaint seeks an array of other equitable relief, but the Court either: (1) cannot decipher its meaning, *see, e.g.,* R. 1 ¶ 246(E) (seeking an injunction against "using trickery, duress, fabrication and/or false testimony and/or evidence, and in failing to disclose exculpatory evidence, in preparing and presenting reports and court documents to the court, causing an interference with parental rights, including those as to 5 familial relations"); (2) finds the need for the requested relief belied by the plaintiffs' own allegations, *see, e.g. id.* ¶ 246(G) (seeking an injunction against "setting forth allegations in DCFS Court against parents . . . regardless of whether or not specific, articulable evidence exists," despite also pleading that appeals to administrative courts only follow a finding a neglect based on credible evidence); *see also id.* at ¶ 246(I); or (3) finds that the plaintiffs do not allege facts plausibly suggesting the practice they seek to enjoin actually takes place, and, even if they did, that they lack standing to seek the requested relief because they do not allege to have suffered the harm it would redress, *see* R. 1 ¶ 246(H) (seeking an injunction against DCFS "making knowingly false allegations of child abuse, neglect, or abandonment . . . as a means of intimidating parents, by coercion, into accepting lesser charges . . . thereby enabling the county to . . . record the case as a positive outcome for purposes of statistical analysis related to funding by the State and Federal governments").

DCFS employees that will ensure their comportment with families' constitutional rights. *See id.* ¶¶ 146(F), 146(J)-(M).

### Discussion

## I. Challenges to Judge Djurisic's Judgment on its Merits

As an initial matter, the plaintiffs make a number of allegations and seek several forms of relief (including removal of their names from the SCR) that amount to challenges to Judge Djuristic's judgment on its merits. Where appellate review of a state administrative ruling is vested by statute in the state circuit courts and no appeal is taken, "the scope of [federal] review . . . is extremely limited and is no substitute for a direct appeal." *Suggs v. C.W. Transport, Inc.*, 421 F. Supp. 58, 62 (N.D. Ill. 1976). Although federal courts may consider constitutional claims collateral to an administrative judgment, claims that the judgment was "erroneous," "factually incorrect," or "against the manifest weight of the evidence" do not present such a constitutional claim. *Id.*

A plaintiff also may not seek in a federal lawsuit to overturn an adverse state administrative judgment. *Van Harken*, 103 F.3d at 1349. Although nothing prevents a plaintiff from bringing a lawsuit under § 1983 challenging the constitutionality of a rule or procedure underlying an adverse administrative judgment, a plaintiff may not seek to avoid the judgment itself through a federal lawsuit. *Id.* (holding that a class of plaintiffs could challenge the city's administrative procedures for assessing parking fines, "[b]ut insofar as they are seeking refunds of the parking fines imposed upon them, they are barred").

Accordingly, the plaintiffs' allegations that Judge Djurisic "got it wrong" are insufficient to confer authority on this Court to reconsider his judgment on its merits. The plaintiffs' only recourse for such a grievance is a direct appeal to the circuit court under the Illinois Administrative Review Law.[12] *Suggs*, 421 F. Supp. at 62; *see also Maum Meditation House of Truth v. Lake Cnty., Ill.*, 55 F. Supp. 3d 1081, 1090 (N.D. Ill. 2014). Additionally, the plaintiffs are barred from seeking relief in this lawsuit in the form of an order that DCFS remove their names from the SCR, and the Court cannot order Former-Director Sheldon to show cause why his decision should be overturned. *See id.* For this same reason, the plaintiffs' "Motion to Order Defendants George Sheldon and Deanna Large to remove Plaintiffs' names from Illinois SCR Register," R. 95, is denied.

Nothing, however, prevents this Court from considering the constitutional and state law claims raised by the plaintiffs that Judge Djurisic did not address or did not have the opportunity to address. Neither the Illinois Abused and Neglected Child Reporting Act ("ABCRA") nor the DCFS rules governing administrative appeals conveys authority on Judge Djurisic to consider the plaintiffs' § 1983 claims or their state law claims. And it does not appear from the current record that any such claims were put before him. Thus, the Court may consider those claims here. *See, e.g., Ibitayo v. McDonald*, 2003 WL 22767046, at *3-4 (N.D. Ill. 2003) (issue preclusion did not bar claims where, "[t]aking the facts as alleged by Plaintiff as

---

[12]    If such a review is now time-barred (on which this Court takes no position), that does not change the Court's analysis.

true, the state court never considered" the constitutionality of searches by DCFS, and the state court's determination "did not necessarily include consideration of whether the constitutional rights of the family or children were violated by the conduct of DCFS").

## II. Defendants Dismissed Outright for Failure to State a Claim

Before turning to the substance of the plaintiffs' claims, this Court dismisses four defendants—DCFS defendants Nora Harms Pavelski and Stevie Lemon, doctor defendant Melissa Cirrillo, and SCR administrator Deanna Large—outright. Other than identifying those individuals' job positions, the complaint is silent as to their roles in any of the alleged deprivations. For that reason, they are properly dismissed. *E.g.*, *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1014 (7th Cir. 2000).

## III. 42 U.S.C. § 1983 Claims

The plaintiffs allege numerous violations of their rights under the First, Fourth, Sixth, and Fourteenth Amendments pursuant to § 1983. To state a claim under § 1983, a plaintiff must allege (1) the deprivation of a right secured by the Constitution or laws of the United States that (2) was committed by a person acting under color of state law. 42 U.S.C. § 1983 ("Every *person* who, under color of any statute, ordinance, regulation, custom or usage, of any State . . . subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution laws, shall be liable to the party injured in an action at law.") (emphasis added); *Brokaw*, 235 F.3d at 1009 (citation omitted).

The Court first will address a number of general arguments made by different groups of defendants regarding whether they are subject to liability under § 1983. The Court then will address each alleged constitutional violation in turn.

**A.    General Arguments Regarding Defendants' § 1983 Liability**

**1.    The DCFS Defendants**

The DCFS defendants (Former-Director Sheldon, Judge Djurisic, the attorney defendants, and the social worker defendants and their supervisors) do not dispute that in their individual capacities, they are "persons" acting under color of state law within the meaning of the § 1983. *See Shields v. Ill. Dep't of Corrections*, 746 F.3d 782, 789 (7th Cir. 2016).

The DCFS defendants nevertheless make blanket arguments that they are not subject to liability under § 1983 because they are: (1) not personally liable; and (2) entitled to qualified immunity. To state a claim for personal liability against public employees, plaintiffs must allege how each official personally deprived them of a federal right. *Brokaw*, 235 F.3d at 1012. "[A]n official satisfies the personal responsibility required of § 1983 if she acts or fails to act with a deliberate or reckless disregard of the plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge or consent." *Id*. Because this is an individualized inquiry, the Court will evaluate whether and with respect to which defendants the plaintiffs have adequately pleaded personal responsibility when considering particular constitutional claims below.

Even where a plaintiff adequately alleges personal involvement of a public employee in the deprivation of a constitutional right, that employee is entitled to qualified immunity "for actions taken while performing discretionary functions, unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 1022; *see also Ibitayo*, 2003 WL 22765046, at *5 ("Qualified immunity remains as a basis on which to grant a motion to dismiss.") (collecting authority).

To state a claim against a public employee defendant in his or her individual capacity under § 1983, a plaintiff must not only allege the violation of a constitutional right, but also that the right was clearly established. *See Doe v. Heck*, 327 F.3d 492, 509 (7th Cir. 2003) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries . . . If, on the other hand, a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.") (citing *Saucier v. Katz*, 533 U.S. 194 (2001)). Because qualified immunity offers not merely a defense from liability, but also provides immunity from suit, courts address the issue as early as possible. *Hughes v. Jones*, 40 F. Supp. 3d 969, 985 (N.D. Ill. 2014) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

Here, as with the personal responsibility inquiry, the Court will evaluate whether particular defendants are entitled to qualified immunity when considering specific constitutional claims below.

## 2. Mafee and the Lurie Defendants

Mafee and the Lurie defendants claim that, as private citizens and entities, they are not susceptible to liability under § 1983. Ordinarily, it is true that a private citizen or entity cannot be held liable under § 1983. *Brokaw*, 235 F.3d at 1016. But this bar is not automatic. "[I]f a private citizen conspires with a state actor, then the private citizen is subject to Section 1983 liability." *Id.* (citation omitted). And private corporations can be held liable under § 1983 if a plaintiff must allege that his injury was caused by an unconstitutional policy, custom, or practice of the corporation. *Shields*, 746 F.3d at 795-96 (expressing doubts about the wisdom and precedential basis of the rule against respondeat superior liability for private corporations, but holding that "[f]or now, this circuit's case law still extends *Monell* from municipalities to private corporations") (collecting circuit authority), *cert. denied*, 135 S.Ct. 1024 (2015).

Here, construing the complaint liberally as the Court must, the plaintiffs allege that the private individual actors in this case (*i.e.*, Mafee and the Lurie defendants) conspired with state actors and that the private corporations' unconstitutional policies or practices caused their injuries. Accordingly, Mafee and the Lurie defendants are not entitled to a blanket ruling that they are private entities and individuals shielded from liability under § 1983. The Court will evaluate whether the plaintiffs have alleged specific facts supporting liability for Mafee and the Lurie defendants below in connection with its analysis of the plaintiffs' constitutional claims.

### B.    First, Fourth, Sixth, and Fourteenth Amendment Claims under § 1983

The plaintiffs assert violations of the First, Fourth, Sixth, and Fourteenth Amendments. The Court analyzes all of these claims in turn, though not necessarily in order, and groups the claims where appropriate to avoid duplicative analysis.

### 1.    First & Fourteenth Amendments: Parents' right to choose the mode of medical treatment for their child

The plaintiffs allege that the doctor defendants and the Lurie John Does conspired with DCFS to require the plaintiffs to administer Keppra to A.T., even though doing so was contrary to the plaintiffs' sincerely held religious beliefs and not in A.T.'s medical interest. R. 1 (Claim 1, Counts 1 & 3). They allege that the doctor defendants did so in order to "get back at" the plaintiffs and provide a financial benefit to the corporate Lurie Defendants. They allege that under the circumstances, a religious accommodation was required. And because no course of treatment could promise to prevent A.T.'s seizures altogether, the plaintiffs allege that the proper religious accommodation would have been to continue treating A.T. with the ketogenic diet. They appear to seek both an injunction against having to give A.T. Keppra going forward and a variety of damages.

The Court assumes for the purposes of its analysis that despite failing to plead the religion they ascribe to or the basis of their objection to pharmaceutical drugs, the plaintiffs have adequately alleged their religious beliefs and that giving A.T. Keppra is contrary to those beliefs. That is not enough to state a claim under

the First Amendment, however, because the right to freely exercise one's religion is limited where the health of a minor is at stake. *See People ex. rel. Wallace v. Labrenz*, 104 N.E. 2d 769 (Ill. 1952). The Illinois Supreme Court held more than sixty years ago that Jehovah's Witnesses' First Amendment rights were not violated when a court appointed a guardian ad litem to approve a blood transfusion for their child, despite their religious objections to the procedure. *Id.* at 773. The Court sustained a finding of neglect based on parents' refusal to permit their child to receive a blood transfusion despite the almost certain risk of severe brain damage or death without one, where the parents had not failed in their parental duties in any other respect. *Id.* In reaching that conclusion, the *Labrenz* court held that while "freedom of religion and the right of parents to the care and training of their children are to be accorded the highest possible respect," *id.* (citations omitted), "neither rights of religion or rights of parenthood are beyond limitation," *id.* at 773-74 (quoting *Prince v. Mass.*, 321 U.S. 158, 167 (1944)).

Setting forth the contours of those limitations, the *Labrenz* court recited the long-settled principle that "[l]aws are made for the government of actions, and while they cannot interfere with [ ] religious belief and opinions, they may with practices." *Id.* at 774 (quoting *Reynolds v. United States*, 98 U.S. 145, 166 (1878)). Where parents' religious practices endanger their child's life, those practices fall beyond the scope of the Free Exercise clause. *Id.* (citing *Prince*, 321 U.S. at 166 ("The right to practice religion does not include liberty to expose the community or child to communicable disease or the latter to ill health or death . . . Parents may be free to

become martyrs themselves. But it does not follow they are free, in identical circumstances, to make martyrs of their children before they have reached the age of full and legal discretion when they can make that choice for themselves.")); *see also In re A.E.*, 2013 WL 4678227, at * 5 (Ill. App. Ct. Aug. 26, 2013) (unpublished) ("Respondent is certainly allowed to be of the opinion that traditional medical care is not necessary, but that does not mean she can practice those beliefs to the extent they provide for the ill health of her children.").

Under *Labrenz*, if the plaintiffs' religious practices unduly endangered A.T.'s life or well-being, the First Amendment did not confer on them the liberty to engage in those practices. Judge Djurisic found, after reviewing hundreds of pages of exhibits and hearing sworn testimony from three physicians, that treating A.T. with the ketogenic diet alone exposed him to risk of status epilepticus, brain damage, and possibly death. *See* R. 125 at 16-17. He found that the ketogenic diet, while efficacious in certain cases of epilepsy, was inadequate to control A.T.'s seizures, and furthermore that the plaintiffs should have recognized as much. *See id*. This Court cannot review or contradict those findings. *E.g.*, *Suggs*, 421 F. Supp. at 62 (federal courts may not review claims that state administrative judgment was "erroneous," "factually incorrect," or "against the manifest weight of the evidence"); *University of Tenn. v. Elliott*, 478 U.S. 788, 799 (1986) ("[W]hen a state agency acting in a judicial capacity resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate," federal courts must give the agency's "factfinding . . . preclusive effect.") (internal punctuation and citation

omitted). Therefore, the plaintiffs have not alleged a violation of their rights under the First Amendment.

Religion aside, the plaintiffs argue that "[p]arents' [r]ight to make health care decisions for their child is absolute," and "[s]tate interference in the child's medical care . . . constitutes a gross violation of the parents' fundamental rights." R. 148-1 at 1. In support, the plaintiffs rely primarily on *Hofbauer v. Saratoga County Department of Social Services*, 393 N.E.2d 1009 (Ct. App. N.Y. 1979). The *Hofbauer* case involved a child with Hodgkin's disease. *Id.* at 1011. The child's attending physician recommended that he should be seen by an oncologist or hematologist to begin radiation and chemotherapy. *Id.* at 1012. Rather than pursue that course of treatment, the child's parents took him to Jamaica, where a course of nutritional therapy was initiated, which was then overseen locally by a licensed physician in New York. *Id.* On appeal, the highest court of New York affirmed the legal determination reached by the appellate division that the child's parents had not neglected him by pursuing the alternative, less traditional treatment regimen. *Id.* at 1013-14. The court took pains to note that its ruling was confined to the unique facts of that case, which the court lacked authority to review. *Id.* at 1012 ("[W]e note that our scope of review is narrow in a case[ ] such as this, coming to us with affirmed findings of fact . . . because the court is without power to review the findings of fact if such findings are supported by evidence in the record.").

Four facts not present in this case were critical to the *Hofbauer* court's legal analysis: (1) the parents had sought the opinions of numerous doctors before

settling on a course of treatment; (2) the nutritional treatment was being supervised by a licensed physician, an indication that the treatment "ha[d] not been totally rejected by all responsible medical authority"; (3) there was medical evidence that the treatment was effectively controlling the child's condition; and (4) the parents testified that if their child's condition deteriorated, they would consent to the administration of conventional treatments. *Id.* at 1013. Critically, the *Hofbauer* court found it "abundantly clear that this is not a case where the parents, for religious reasons, refused necessary medical procedures for their child." *Id.* at 1014. The *Hofbauer* case therefore does not hold, as the plaintiffs argue, that their right to make medical decisions for A.T. is absolute. Quite to the contrary, the case acknowledges limitations on that right, and considers parental refusal to provide necessary treatment to fall outside the bounds of constitutionally protected parental conduct.

## 2. Fourth and Fourteenth Amendments: Unlawful search and seizure and interference in familial relations

The plaintiffs allege three incidents in the course of the DCFS investigation that implicate their constitutional rights. First, they allege that certain of the Lurie defendants, working together with DCFS, unlawfully detained A.T. at the hospital by refusing to discharge him for 36 hours after he was fully recovered and medically ready to go home. Second, they allege that the social worker defendants undertook an unnecessarily extensive search of their children's bodies at their home after gaining entry only by threatening to remove both A.T. and his brother from the

plaintiffs' custody. They further allege that these threats violated their fundamental right of familial association. Finally, the plaintiffs allege that the social worker investigators unlawfully detained, questioned, and physically examined A.T. at school without parental knowledge or consent. In connection with all of these incidents, the plaintiffs make an official-capacity claim against Former-Director Sheldon, alleging that he was responsible for sanctioning policies and setting priorities that permit "widespread" detentions and interrogations of these types to occur.

### a.　　The Incident at Lurie's

Turning first to the claim that requiring A.T. to remain in the hospital for 36 hours after he was medically ready for discharge violated the Fourth Amendment, the plaintiffs allege that on or around February 28, 2016, Dr. Lauren E. Marsillio and John Doe 3 "accused plaintiffs of medical neglect," and a call was made to DCFS. R. 1 ¶ 68. They allege that John Doe 3 then took the plaintiffs into a separate room and told Tyagi that if they tried to leave with A.T., a police officer waiting in the lobby would be called up to speak with them. R. 148-1 at 4-5. The hospital did not discharge A.T. for more than 36 hours after that, the plaintiffs allege, despite the fact that the hospital and doctors had determined that A.T. had recovered and was ready for discharge. *Id.* The plaintiffs allege they did not feel free to leave during this time in light of the threat of police officer contact. *Id.*

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and

seizures, shall not be violated." "Because the basic purpose of the Fourth Amendment is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials, the amendment's prohibition against unreasonable searches and seizures protects against warrantless intrusions during civil as well as criminal investigations by the government." *Heck*, 327 F.3d at 509 (internal citations and quotation marks omitted). What constitutes "unreasonable" under the Fourth Amendment "is not capable of precise definition or mechanical application, and its proper application requires careful attention to the facts and circumstances of each particular case." *Brokaw*, 235 F.3d at 1010 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

"A person has been seized within the meaning of the Fourth Amendment if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Based on Tyagi's alleged conversation with John Doe 3 and the alleged presence of a police officer on site, it was reasonable for the plaintiffs to believe they and A.T. were not free to leave Lurie's. Therefore, the plaintiffs have plausibly alleged a seizure. Furthermore, it is plausible that it was not reasonable for purposes of the Fourth Amendment to hold A.T. any longer than medically necessary.

The plaintiffs have not, however, met their burden of pleading "the 'clearly established rights' that have been violated." *Magdziak v. Byrd*, 1995 WL 704394, at *6 (N.D. Ill. Nov. 29, 1995), *aff'd*, 96 F.3d 1045 (7th Cir. 1996) (quoting *Alvarado v.*

*Picur,* 859 F.2d 448, 452 (7th Cir.1988)) (dismissing § 1983 claims). The plaintiffs do not address whether the right not to be held past medical necessity is clearly established. Thus, at least as the record currently stands, plaintiffs have not defeated John Doe 3's or Dr. Marsillio's qualified immunity defenses. Additionally, the plaintiffs have not adequately alleged Dr. Marsillio's personal involvement in the alleged seizure; they merely allege that she was personally involved in the medical neglect referral and in discharging A.T. And plaintiffs have not alleged that John Doe 3 acted pursuant to a policy, custom, or practice of the corporate defendants as required to hold the corporate defendants liable under § 1983. *See Shields*, 746 F.3d at 795-96. The Court therefore dismisses the plaintiffs' Fourth Amendment claims with respect to the incident at Lurie's.[13]

---

[13]     Plaintiffs also make a number of generalized allegations regarding the removal of children from their parents' custody and the alleged practice of "medical kidnapping." *See, e.g.*, R. 155 (motion to intervene); R. 156 (motion to declare the Adoption and Safe Families Act unconstitutional). But it is undisputed that A.T. was never removed from the plaintiffs' custody and the plaintiffs were never prevented from seeing him at the hospital during his stay or from staying with him overnight. And though A.T. was alleged to have been held in at Lurie's for 36 hours after being medically ready for discharge, he was not placed in state custody during that time, enrolled in clinical trials, or forced to take experimental medications or undergo experimental procedures without parental knowledge or consent.

"To meet the standing requirements of Article III, a plaintiff must allege *personal injury* fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Raines v. Byrd*, 521 U.S. 811, 819 (1997) (emphasis in original) (internal quotations omitted) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). The Supreme Court "has consistently stressed that a plaintiff's complaint must establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered is particularized as to him." *Id.* (citing authority). Because it is undisputed that A.T. was never removed from the plaintiffs' custody, defendants' motions to dismiss are granted with respect to any

### b. The Incident at the Plaintiffs' Home

Turning next to the search in the plaintiffs' home, the plaintiffs allege that on two different occasions, defendants Rubio and Burleson threatened to take A.T. and his brother from their parents "unless [Rubio and Burleson] were allowed inside the home immediately" to perform a "strip search." R. 1 ¶ 185. The plaintiffs say they consented to entry only because Rubio and Burleson threatened to take the children if they did not consent. *Id.* Then, without parental consent, Rubio and Burleson allegedly "pulled down the pants and underwear of" A.T. and his brother "and inspected" their bodies. *Id.* at ¶ 186. The plaintiffs' allegations regarding the incident in their home raise two potential constitutional claims: a Fourth Amendment claim regarding the search, and a Fourteenth Amendment substantive due process claim regarding the threat of removal.

**The Search.** "When the Fourth Amendment was ratified, as now, to 'search' meant '[t]o look over or through for the purpose of finding something; to explore; to examine by inspection.'" *Heck*, 327 F.3d at 509-10 (citing *Kyllo v. United States,* 533 U.S. 27, 33 n. 1 (2001) (quoting N. Webster, *An American Dictionary of the English Language* 66 (1828) (reprint 6th ed. 1989))); *Darryl H. v. Coler*, 801 F.2d 893, 900 (7th Cir. 1986) ("A search within the meaning of the fourth amendment occurs when the government intrudes upon an individual's legitimate expectation of privacy.").

---

generalized claims regarding removing children from their parents' custody or the alleged practice of "medical kidnapping."

The search the plaintiffs allege plainly meets this definition. And the plaintiffs' allegations, if true, describe an unreasonable search. Requiring children—especially those whose well-being is not in question like A.T.'s brother—to pull down their underpants without parental consent and in the absence of allegations such as spanking or sexual abuse is not reasonable. The plaintiffs have thus pleaded a plausible Fourth Amendment claim based on the search at the plaintiffs' home. And they have adequately alleged Rubio's and Burleson's personal involvement in that search.

Nor are Rubio and Burleson entitled to qualified immunity. The right for children to be free from unduly invasive physical inspections on private property in similar circumstances is clearly established. *See Michael C. v. Gresbach*, 526 F.3d 1008, 1017 (7th Cir. 2008) ("[W]e find that a reasonable child welfare worker would have known that conducting a search of a child's body under his clothes, on private property, without consent or the presence of any other exception to the warrant requirement of the Fourth Amendment, is in direction violation of the child's constitutional right to be free from unreasonable searches"); *Franz v. Lytle*, 997 F.2d 784, 792 (7th Cir. 1993) (no reasonable officer would believe that he could visually and physically inspect two-year old child's vagina based on one complaint that the child had a severe diaper rash).

The plaintiffs' Fourth Amendment claim with respect to the search at the plaintiffs' home will proceed with respect to Rubio and Burleson in their individual capacities.

**The Threat of Removal.** Substantive due process "protects an individual from the exercise of governmental power without a reasonable justification." *Belcher v. Norton*, 49 F.3d 742, 753 (7th Cir. 2007). "The Supreme Court has long recognized as a component of substantive due process the right to family relations." *Brokaw*, 235 F.3d at 1018. It is clearly established under Seventh Circuit law that undue interference in the familial relationship violates the fundamental liberty interest of parents in the care, custody and management of their children. *See id.* at 1018-19 (collecting authority on the contours of the constitutional right to familial relations). Accordingly, the "threat to remove" minor children "from the custody of their parents violate[s]" the parents' "right to familial relations." *Heck*, 327 F.3d at 524. A violation occurs even if "defendants d[o] not make good on their threat." *Id.*

Here, the plaintiffs have plausibly alleged that Rubio and Burleson personally threatened to remove A.T. and his brother from their parents' custody and thus violated the plaintiffs' substantive due process rights. And the right to be free from such a threat is clearly established under Seventh Circuit law. As such, Rubio and Burleson are not entitled to qualified immunity.

The plaintiffs' Fourteenth Amendment substantive due process claim will proceed with respect to Rubio and Burleson in their individual capacities.

### c.   The Incident at A.T.'s Public School

The final alleged investigation-related incident involved interviews with A.T. at his public school by all three social worker defendants (Rubio, Stephens, and Burleson) in March 2016 and May 2016. R. 1 ¶ 177. The plaintiffs allege that the

social worker defendants performed these interviews without their consent, and that they involved 15-20 minutes of intrusive questions and an inspection of A.T.'s body. *Id.* at ¶¶ 177-78. The plaintiffs allege that Chicago Public Schools and its employees did not offer A.T. the opportunity to call his parents or tell him he was free not to answer the questions. *Id.* at ¶¶ 179-80. The plaintiffs' allegations regarding the incident in their home raise two potential Fourth Amendment claims: a claim regarding the interrogation and a claim regarding the search.

**The Interrogation.** In *Heck*, the Seventh Circuit held that warrantless seizure of a student at a private school in the absence of a warrant, consent, or exigent circumstances violated the Fourth Amendment. 327 F.3d at 517. In reaching that decision, the Seventh Circuit expressly distinguished a private school interrogation from an interrogation at a public school. *Id.* at 511-17. It explained that "a lower standard of scrutiny applies to searches and seizures conducted by the government on public school property." *Id.* at 514.

In light of the distinction in *Heck* between public and private school, A.T. likely had no reasonable expectation of privacy at his public school that would give rise to a Fourth Amendment claim based on the interrogation alone. And even if he did, Rubio, Stephens, and Burleson would have qualified immunity because any such right is not clearly established under Seventh Circuit law. The plaintiffs' Fourth Amendment claim with respect to the alleged interrogation at A.T.'s public school is therefore dismissed.

**The Search.** The Seventh Circuit in *Heck* reaffirmed its prior holding in *Darryl H.* that on public school property, it could "not 'say that the Constitution requires that a visual inspection of the body of a child who may have been the victim of child abuse can only be undertaken when the standards of probable cause or a warrant are met.' Instead, . . . the constitutionality of these inspections should be evaluated under the reasonableness test of the Fourth Amendment." *Id.* at 513-14 (quoting *Darryl H.*, 801 F.2d at 902). Under the reasonableness test, the question becomes whether "the government officials in question had 'some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse.'" *Id.* at 515 (quoting *Brokaw*, 235 F.3d at 1019).

In *Darryl H.*, the Seventh Circuit implied that a visual inspection of a minor at a public school, if performed without the parents' consent and without definite and articulable evidence of abuse, might violate the Fourth Amendment. 801 F.2d at 907. But the *Darryl H.* Court "expressly declined to rule on the constitutionality of the examinations" in that case and "found that the constitutional rights and issues involved were far from 'clearly established.'" *Lanstrom v. Illinois Dep't of Children & Fam. Servs.*, 892 F.2d 670, 676 (7th Cir. 1990) (discussing *Darryl H.*).

Here, the plaintiffs may very well have stated a Fourth Amendment claim with respect to the visual inspection of A.T. at his public school. They plausibly allege that the social worker defendants performed a visual inspection of A.T.'s body without parental consent and with allegedly limited evidence giving rise to a

reasonable suspicion of imminent danger of abuse. But because (1) the Court in *Darryl H.* expressly declined to rule on the constitutionality of the physical inspections in that case, and (2) the reasonableness of such a search at public school is not clearly established under Seventh Circuit law, the social worker defendants have qualified immunity on that claim. The plaintiffs' Fourth Amendment claim with respect to the alleged physical examination at A.T.'s public school is therefore dismissed.

### d. Official Capacity Claims Against Former-Director Sheldon (Claims 2 & 7)

In addition to individual-capacity claims against the DCFS defendants, the plaintiffs make official-capacity claims against Former-Director Sheldon for allegedly permitting widespread searches and seizures of minors to occur. The DCFS defendants argue that these claims are barred by the Eleventh Amendment. R. 119 at 14. As a general rule, the Eleventh Amendment bars federal suits against state officials in their official capacities. *Brokaw*, 235 F.3d at 1009; *see also Evans v. Torres*, 1999 WL 1010983, at *3 (N.D. Ill. Sept. 30, 1999) (noting that "DCFS is treated the same as a State for the purposes of the Eleventh Amendment"). But official-capacity suits against state officials seeking prospective, equitable relief are not barred by the Eleventh Amendment. *Williams v. Wisconsin*, 336 F.3d 576, 580–81 (7th Cir. 2003) (citing *Ex parte Young,* 209 U.S. 123 (1908)). Thus, to the extent the plaintiffs' official-capacity claims against Former-Director Sheldon seek injunctive relief in the form of an order preventing future violations of their

constitutional rights (as they do, in part), they are not barred by the Eleventh Amendment. *Williams*, 336 F.3d at 580–81.

Separate and apart from the application of the Eleventh Amendment, however, a plaintiff's claim for an injunctive relief must be plausible. *Iqbal*, 556 U.S. at 678. And in this case, the plaintiffs' allegations regarding Former-Director Sheldon's participation in creating a policy regarding unlawful searches and seizures and threats of removal are far too conclusory to set forth a plausible custom, policy, or practice. The plaintiffs allege that Former-Director Sheldon was responsible for sanctioning policies and setting priorities that permit widespread detentions and interrogations to occur. R. 1 ¶¶ 218-24. But they do not provide any specific facts plausibly supporting that Former-Director Sheldon in fact implemented these supposed priorities and sanctioned these policies. *Id.* ¶¶ 218-24, 255. Therefore, the official-capacity claims against Sheldon (Claims 2 & 7) seeking prospective equitable relief are dismissed.

### 3.      Sixth Amendment: Right to confront witnesses

The plaintiffs allege that by failing to compel the presence of subpoenaed witnesses, Judge Djuristic denied them the opportunity to "confront and cross-examine adverse witnesses." Citing to the rules governing appeals of child abuse and neglect investigations, they also allege to have been entitled (and denied the right) to confront the John Doe witness who made the DCFS referral in February 2016. They invoke the Confrontation Clause of the Sixth Amendment as the source of these rights. The Confrontation Clause provides that "in all criminal

40

prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const., amend. VI.

The DCFS defendants argue that the plaintiffs are foreclosed from raising a Sixth Amendment claim because they failed to exhaust administrative remedies. But there is no exhaustion requirement under § 1983. *Veterans Legal Defense Fund v. Schwartz*, 330 F.3d 937, 941 (7th Cir. 2003).

The DCFS defendants also argue that the Confrontation Clause applies by its terms only to criminal proceedings. R. 119 at 8 ("No court has ever found that the Sixth Amendment guarantees a right to cross examine witnesses in a civil administrative review process."). That position might be overly simplistic. *See Vidinski v. Lynch*, 840 F.3d 912 (7th Cir. 2016) (Sixth Amendment might apply in immigration removal hearings).

In any event, even if the plaintiffs had a right to cross-examine witnesses at the administrative hearing, Judge Djurisic is protected from liability by the doctrine of judicial immunity. *Brokaw*, 235 F.3d at 1015 ("judges are not liable in civil actions for their judicial acts unless they have acted in the clear absence of jurisdiction"; indeed, "a judge will not be deprived of immunity even if the action was in error, was done maliciously, was in excess of his authority, and even if his exercise of authority is flawed by the commission of grave procedural errors") (internal citations omitted); *Eades v. Sterlinske*, 810 F.2d 723, 725-26 (7th Cir. 1987) (judicial immunity applies to Sixth Amendment violations in criminal

sentencing proceedings). Accordingly, the plaintiffs' Sixth Amendment claim is dismissed.

### 4.    Fourteenth Amendment Procedural Due Process

The plaintiffs allege a variety of alleged procedural errors in the DCFS investigation and administrative appeal, including use of the "credible evidence" standard to indicate a finding of medical neglect, disregarding exculpatory evidence, and deadline issues. To plead a procedural due process claim under § 1983, a plaintiff "must sufficiently allege (1) that she had a cognizable liberty interest under the Fourteenth Amendment; (2) that she was deprived of that liberty interest; (3) and that the deprivation was without due process." *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013). As set forth below, none of the plaintiffs' alleged errors supports a plausible procedural due process claim.

### a.    "Credible Evidence" Standard

The plaintiffs allege that "the use of the credible-evidence standard of proof to support the indicated finding" of medical neglect violated their procedural due process rights. R. 1 ¶¶ 117, 199. But "credible evidence" is the appropriate standard of proof for pre-deprivation proceedings, including to support the indicated finding necessary to place an individual on the SCR. *E.g.*, *Dupuy v. Samuels*, 397 F.3d 493, 505-07 (7th Cir. 2005) (district court did not abuse discretion by permitting DCFS "to retain the term 'credible evidence' in its articulation of the governing standard of proof" "for the pre-indication stage of the investigation"). And Judge Djuristic applied the appropriate, "preponderance of the evidence" standard in the post-

deprivation proceedings in this case. *See id.* at 507-08. Thus, the appropriate standards were applied, and the use of a "credible evidence" standard to indicate a report in pre-deprivation proceedings does not support a procedural due process claim.

### b.     Exculpatory Evidence

The plaintiffs allege that DCFS attorneys who represented the agency presented false or fabricated evidence and suppressed exculpatory evidence. R. 1 ¶¶ 149, 151. But the plaintiffs do not allege specifically what exculpatory evidence was fabricated or suppressed. If they are referring to evidence about the efficacy of the ketogenic diet, their claim is belied by the state's stipulation at the administrative hearing "that the Ketogenic Diet is a medically recognized and valid form of treatment for some cases of Epilepsy to prevent seizure that may lead to episodes of Status Epilepticus." R. 125 at 5. At least as currently pleaded, the plaintiffs fail to state a procedural due process claim with respect to the suppression of exculpatory evidence.

### c.     Deadline Issues

Turning to the plaintiffs' various and generalized allegations regarding the violations of deadlines, as the Seventh Circuit has explained:

> While a plaintiff is not required to exhaust state remedies to bring a § 1983 claim, this does not change the fact that no due process violation has occurred when adequate state remedies exist. The whole idea of a procedural due process claim is that the plaintiff is suing because the state failed to provide adequate remedies. Therefore, we do not require a plaintiff to pursue those remedies in order to challenge their adequacy, but likewise we do not allow a plaintiff to claim that she was denied due process just because she chose not to

pursue remedies that were adequate. Given the availability of state remedies that have not been shown to be inadequate, plaintiffs have no procedural due process claim.

*Veterans Legal Defense Fund v. Schwartz*, 330 F.3d 937, 941 (7th Cir. 2003).

Here, Jagatia never appealed the ruling that she was not within the category of persons entitled to expedited review. She therefore failed to take advantage of "adequate state remedies," and she has "no procedural due process claim." *See id.* Additionally, the facts pleaded in the plaintiffs' complaint are too conclusory to allege Judge Djuristic's ruling was manifestly erroneous. Even if it was, Judge Djurisic is protected from liability by the doctrine of judicial immunity. *Brokaw*, 235 F.3d at 1015.

It does not appear to the Court that any other deadlines were missed, but even if they were, the relatively minor delays do not raise procedural due process concerns.

### d. Other Issues

The plaintiffs' other procedural due process allegations regarding prosecutorial and witness misconduct are conclusory at best. Without more, the attorney defendants are protected by prosecutorial immunity and the doctor defendants are protected by witness immunity. *See Ibitayo*, 2013 WL 22765046, at *4.

### 5. Fourteenth Amendment Substantive Due Process

The plaintiffs allege that in filing an indicated report with SCR that resulted in their names being listed in a registry, defendants deprived them of their liberty

interest in pursuing the profession of their choosing. The plaintiffs do not allege what specific positions they were terminated from or ineligible for, but instead state generally that they have been prevented from holding jobs that require contact with children.

As explained above, substantive due process "protects an individual from the exercise of governmental power without a reasonable justification." *Belcher*, 49 F.3d at 753. The right to pursue a chosen career is not a fundamental right; as such, rational basis review applies. *Hughes v. Jones*, 40 F. Supp. 3d 969, 986-88 (N.D. Ill. 2014).

A plaintiff cannot state a substantive due process claim based on an SCR registry listing where an unappealed administrative ruling held that the plaintiff committed neglect, meaning that his or her name rightfully appears on the registry. *See id.* at 984 (unlike procedural due process rights, substantive due process rights depend on the merits of the claimant's substantive assertions, and a plaintiff must show that the denial of due process caused an injury); *Lossman v. Pekarske*, 707 F.2d 288, 291 (7th Cir. 1983) (same). Accordingly, the plaintiffs cannot state a substantive due process claim based on the listing of their names on the SCR's registry.

The plaintiffs also assert that the SCR is unconstitutional. They state that "[a] registry listing amounts to 'life sentence' of being labeled a child abuser that adversely impacts employment and education, charity and child-rearing." R. 139 ¶ 6. They allege that the SCR is available to "public and private employers and

other organizations, even if there is no child connection to the work." *Id.* ¶ 7; *see also id.* ¶ 11.

These allegations are false. The Illinois Abused and Neglected Children Reporting Act, 325 ILCS 5/11, makes clear that "[a]ll records concerning reports of child abuse or neglect . . . shall be confidential and shall not be disclosed except as specifically authorized by this Act or other applicable law." 325 ILCS 5/11. Only certain authorized entities and persons, such as the operator of a licensed child care facility, are able to obtain this information. 325 ILCS 5/11.1(12), 5/11.1(14), 5/11.1(15). And far from amounting to a "life sentence," an individual's name appears on the SER listing for five years only, and listed individuals have a right to appeal. R. 154, Ex. B at pp. 371-81. The plaintiffs were told as much in writing on July 4, 2016. *Id.*

For the same reason the plaintiffs fail to state a substantive due process claim—*i.e.*, because they never appealed the decision sustaining a finding of medical neglect that justified the listing—they have not alleged that the SCR is unconstitutional as applied to them. It necessarily follows that the plaintiffs cannot make a viable constitutional challenge to the SCR on its face. Therefore, the plaintiffs' Motion to Declare the SCR Unconstitutional, R. 139, must be denied.

## IV.     State Law Claims

The plaintiffs also assert three tort claims under Illinois law: intentional infliction of emotional distress, negligent infliction of emotional distress, and invasion of privacy. Defendants do not argue that the plaintiffs have inadequately

pleaded the elements of these claims. Defendants do, however, argue that the plaintiffs' state law claims should be dismissed under the Illinois Tort Immunity Act.

"The Illinois Tort Immunity Act shields state government employees from liability for tortious acts committed in the course of one's government employment." *Bell v. Marseilles Elementary Sch. Dist. #150*, 2001 WL 818897, at *5 (N.D. Ill. Mar. 7, 2001). But willful and wanton acts are specifically excluded. 745 ILCS 10/2-202. Willful and wanton acts are those "which . . . if not intentional, show[] an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210. The willful and wanton standard can be highly fact-dependent: "Under the facts of one case, willful and wanton misconduct may be only degrees more than ordinary negligence, while under the facts of another case, willful and wanton acts may be only degrees less than intentional wrongdoing." *Ziarko v. Soo Line R. Co.*, 641 N.E.2d 402, 406 (Ill. 1994).

Because negligence is by definition a lesser state of mind than willful and wanton, "negligence claim[s are] barred by the Illinois Tort Immunity Act." *Remblake v. Cty. of Will*, 2010 WL 3732146, at *2 (N.D. Ill. Sept. 16, 2010) (quoting *Miller v. Womak,* 2010 WL 2522994, at *1 (C.D. Ill. 2010)). Accordingly, the plaintiffs' negligent infliction of emotional distress claim is dismissed. *See id.* (dismissing negligent infliction of emotional distress claim under Illinois Tort Immunity Act); *Cheatham v. City of Chicago*, 2016 WL 6217091, at *2 (N.D. Ill. Oct. 25, 2016) (same).

The plaintiffs' intentional infliction of emotional distress and invasion of privacy claims, by contrast, require an intentional or reckless mental state and so are not automatically barred by the Illinois Tort Immunity Act. *Landstrom v. Ill. Dep't of Children & Family Serv.*, 699 F. Supp. 1270, 1281 (N.D. Ill. 1988) (elements of intentional infliction of emotional distress claim include "intent by the defendant to cause, or a reckless disregard of the probability of causing emotional distress") (quotation marks omitted); *Busse v. Motorola, Inc.*, 813 N.E.2d 1013, 1017 (1st Dist. 2004) (intentionality is required for "invasion of privacy" tort under Illinois law). Rather, the application of the Illinois Tort Immunity Act to these claims depends on the specific facts asserted by the plaintiffs.

The plaintiffs incorporate and assert the same factual basis to support their intentional infliction of emotional distress and invasion of privacy claims that they use to support their § 1983 claims. R. 1 ¶¶ 225-29, 235-39. They also allege that defendants acted intentionally and in an offensive manner showing a conscious disregard for the safety of A.T. R. 1 ¶¶ 225-29, 235-39. These allegations, coupled with the allegations underlying the plaintiffs' surviving § 1983 claims (*i.e.*, the Fourth and Fourteenth Amendment claims regarding the incident at the plaintiffs' home), plausibly allege that defendants Rubio and Burleson engaged in willful and wanton conduct. *E.g.*, *Hill v. Miller*, 878 F. Supp. 114, 117 (N.D. Ill. 1995) ("While it is true that merely claiming that certain conduct was 'willful and wanton' is insufficient to survive a dispositive motion, the facts alleged here, if proven, would support a claim") (internal citation omitted). Thus, to the extent the plaintiffs'

intentional infliction of emotional distress and invasion of privacy claims are co-extensive with their surviving § 1983 claims against defendants Rubio and Burleson, the intentional infliction of emotional distress and invasion of privacy claims also survive. *See, e.g.*, *Landstrom*, 699 F. Supp. at 1281-82 (intentional infliction of emotional distress claim for invasive search of minor in DCFS investigation survived motion to dismiss); *Carlson ex rel. Stuczynski v. Bremen High Sch. Dist. 228*, 423 F. Supp. 2d 823, 830 (N.D. Ill. 2006) (invasion of privacy and intentional infliction of emotional distress claims survived motion to dismiss based on Illinois Tort Immunity Act).[14]

## Conclusion

For the reasons set forth above, the following defendants are dismissed from this case: Former-Director Sheldon in his individual and official capacities, Judge Djurisic, Large, Pavelski, Lemon, Stephens, Epstein, Bicknese, Cirrillo, Mafee, Marsillio, the John Doe defendants, the corporate defendants, and Lurie Hospital.

The following claims are dismissed: under § 1983, the First Amendment claim, the Fourth Amendment claims arising from the incidents at Lurie Hospital and at A.T.'s public school, the Sixth Amendment claim, and the Fourteenth Amendment procedural and substantive due process claims; the negligent infliction

---

[14]    The Court's ruling does not preclude the defendants from raising the applicability of the Illinois Tort Immunity Act again once the facts are further developed. The ultimate determination of whether conduct rises to the level of willful or wanton and the Illinois Tort Immunity Act applies often is "a question of fact" that "depends on the facts and circumstances" of a given case. *Harris v. Thompson*, 976 N.E.2d 999, 1011 (Ill. 2012).

of emotional distress claim; any medical malpractice claim; and all equitable claims (either because the plaintiffs' lack standing or because allegations of unconstitutional policies are conclusory). The plaintiffs' First and Fourteenth Amendment right to choose mode of medical treatment claims, the Fourth Amendment claim based on the incident at A.T.'s public school, the Sixth Amendment claim, the Fourteenth Amendment substantive due process claim, the negligent infliction of emotional distress claim, and claims related to "medical kidnapping" are dismissed *with* prejudice. All other claims are dismissed *without* prejudice. If the plaintiffs believe they can cure the defects identified in this opinion, they may move to file an amended complaint. Any such motion should be filed within 21 days of the date of this ruling and should attach the proposed amended complaint and a memorandum of no more than five pages explaining how the new complaint cures the defects.

The following claims survive defendants' motions to dismiss: the plaintiffs' Fourth and Fourteenth Amendment claims under § 1983 arising from the incidents at the plaintiffs' home against defendants Burleson and Rubio in their individual capacities, and the plaintiffs' intentional infliction of emotional distress and invasion of privacy claims against Burleson and Rubio to the extent they are coextensive with the remaining § 1983 claims.

In addition to the pending motions to dismiss (R. 115, R. 117), this Opinion and Order also resolves a number of other motions pending in this case. The plaintiffs' motion for additional service of summons and complaint by alternative

means (R. 78) is denied as moot. The plaintiffs' motions to file opposing memoranda of law in connection with several of the defendants' responses (R. 159) is granted. The motion to intervene (R. 155) pertains to medical kidnapping and is dismissed for lack of standing. The motion to declare the Adoption and Safe Families Act unconstitutional (R. 156), related intervention motion (R. 155), and accompanying declaration of Kathleen Clark (R. 186) are likewise dismissed for lack of standing. The motion to declare Keppra dangerous (R. 164), related letter from Kathleen Clark (R. 187), motion to appoint an expert (R. 167), and motion to order production of medical records (R. 169) are stricken as contrary to this Court's earlier ruling (R. 122). The motion to declare the DCFS practice of seizing, searching, and interrogating children at public schools without parental consent and in the absence of exigent circumstances unconstitutional (R. 177) is dismissed for the same reason the Court has dismissed Claims 2 and 7 of the complaint. The "Motion to Order Defendants George Sheldon and Deanna Large to remove Plaintiffs' names from Illinois SCR Register" (R. 95), the Lurie defendants' motion to strike non-compliant filings (R. 182), and the plaintiffs' Motion to Declare the SCR Unconstitutional (R. 139) are all denied for the reasons set forth above. The DCFS defendants' motion to leave to file certain records under seal in conjunction with their response to the plaintiffs' Motion to Declare the SCR Unconstitutional (R. 152) is granted.

ENTERED:

Honorable Thomas M. Durkin
United States District Judge


Dated: September 18, 2017